# **EXHIBIT B**

## IN THE SUPERIOR COURT
## MARION COUNTY, INDIANA

**Brittanni George**                      :      **Case No.**   49D13-2006-PL-017706
4934 Ford St.                             :
Speedway, IN 46224                        :
                                          :
                      **Plaintiff**       :
                                          :
vs.                                       :
                                          :
**Republic Airways Inc.**                 :      **COMPLAINT OF RETALIATION AND**
8909 Purdue Dr.                           :      **INTENTIONAL INFLICTION OF**
Indianapolis, IN 46268                    :      **EMOTIONAL DISTRESS**
                                          :
                      **Defendant**       :      FILED

JUN 0 1 2020   (29)

_Myla a. Eldridge_
CLERK OF THE MARION CIRCUIT COURT

### PARTIES

1.      Plaintiff worked for Republic Airline for approximately 10 years until I was wrongfully

discharged in October 2018, and I am a resident of Marion County, Indiana.

2.      Defendant is an Indiana corporation with its principle place of business in Marion

County, Indiana.

### JURISDICTION

3.      This action is filed as a state law action in the superior court of Marion County, Indiana.

Both the Plaintiff and Defendant are residents of Marion County and all charges occurred in

Marion County.  This action is brought within 90 days of receipt of the Right to Sue Letter issued

for **Brittanni George v. Republic Airline EEOC Case No:  470-2019-02226.**

### FIRST CLAIM FOR RELIEF
### Title VII Retaliation

#### I. INTRODUCTION

I was employed for approximately 10 years until I was wrongfully discharged in October

2018 in retaliation for participating in a protected activity.  My domestic partner filed EEOC

Charge No. 470-2018-03161. During my employment, I had no disciplinary or attendance infractions. After I was a witness in a harassment complaint and also my domestic partner filed a charge of discrimination, I was abruptly terminated without reason. Prior to these incidents and my discharge, I was being groomed for a management career.

I have been discriminated against and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended. The timeline of these events is listed below:

- In October of 2015, I began a romantic relationship with John Coomes and my Supervisor, Krista Murdock became aware at that time. We have been Domestic Partners since 2016.

- In December of 2015, Rose Doria reported the relationship to the Supervisor of John Coomes, who was Alex Osleger (**Exhibit 3:** Coomes Aff. ¶ 6).

- In October of 2017, the Respondent investigated Pat Gannon and Michael Dee for discrimination against several protected classes and other unprofessional behavior. I was listed as a witness, along with the specific content of what my testimony would be (**Exhibit 3:** Coomes Aff. ¶ 8).

- On November 7, 2017 John Coomes reported Pat Gannon's retaliatory acts against him for participation in the investigation of Pat Gannon to the Company's Counsel (**Exhibit 7:** Retaliation Notice E-Mail 11-7-17).

- On November 29, 2017 the Respondent was put on notice of a potential EEOC Claim by John Coomes and given a Notice to Preserve (**Exhibit 1**: Coomes Notice to Preserve).

- On June 19, 2018, an EEOC Inquiry was initiated by John Coomes (**Exhibit 2:** EEOC Inquiry).

- On or about June 19, 2018, John Coomes told the Respondent's managerial

personnel of this charge, and it became common knowledge (**Exhibit 3:** Coomes Aff. ¶ 12).

o   On or about June 19, 2018, the Respondent threatened to terminate the employment of John Coomes (Id., ¶ 13).

o   On or about August 28, John Coomes filed a charge of discrimination with the EEOC (Id., ¶ 14). I was listed as a witness, along with the specific content of what my testimony would be.

o   On August 31, 2018, the Respondent once again threatened to terminate the employment of John Coomes (Id., ¶ 15 and **Exhibit 4**: Republic Letter to Coomes)

o   On September 28, 2018, I was suspended with pay.

o   On October 11, 2018, my employment with the Respondent was terminated.

o   On December 31, 2018, I served a Notice to Preserve on the Respondent (**Exhibit 5**: George Notice to Preserve).

## II. DISCUSSION

The Company has created and submitted to the EEOC, a timeline and allegations that are not supported by the facts. The Company became aware of the relationship between Captain Coomes and me in 2015 (**Exhibit 3:** Coomes Aff. ¶ 6), yet Papillion claims October 2017 was the date the Company understood us to be in a relationship (Papillion Aff. ¶ 8). The Company was notified of a pending EEOC claim by Captain Coomes in November 2017 (**Exhibit 3:** Coomes Aff. ¶ 9 and 10 and **Exhibit 1:** Coomes Notice to Preserve), yet the Company claims no nexus to the EEOC claim because it was not filed until August 2018. The Company was clearly on notice of the pending EEOC claim in November 2017, the EEOC inquiry as of June 2018, and finally the charge in August of 2018. This timing coincides with the initiation of the retaliatory

3

acts of the Company towards me.

**Retaliatory Trigger #1**

The Company claims their interest in my relationship began in October 2017 (Id.), which is the same time I was listed as a material witness to the investigation into Gannon (**Exhibit 3:** Coomes Aff. ¶ 8). Even with the elevated interest and a suspicion of wrongdoing, no investigation into the issue was initiated by the Company in October of 2017 (**Exhibit 16:** Defendant's Position Statement Pappillion Aff. ¶ 8). The alleged behavior of passing off information to Captain Coomes to allow him to pick up trips to be bumped, is baseless, and flies in the face of what the Pilot's software interface allows. The software, FLICA, allows pilots to see available flying, and the company is required to post available flying so pilots can view and request the open flying in this software. Captain Coomes had ample access to FLICA, as it is a web-based platform that works well on mobile devices. There is no way to know in advance what trips would be susceptible to displacement (bumped and paid). The Company cannot even determine any trips from which Captain Coomes was bumped (Id. ¶ 10, and **Exhibit 16:** Defendant's Position Statement Sheek Aff. ¶ 5). This claim of concern over "inside information" is a construct made after the fact in an attempt to justify the Company's retaliatory behavior.

**Retaliatory Trigger #2**

The Company is made aware of Captain Coomes' potential EEOC claim in November 2017.

**Retaliatory Trigger #3**

June 2018, the Company is made aware of the EEOC Inquiry initiated by Captain Coomes (**Exhibit 3:** Coomes Aff. ¶ 13). According to the Company's response (p.11 ¶ 1) the Company immediately began to search for incriminating information related to Captain Coomes'

email address associated with his Union work.   They discovered an email sent in the ordinary course of business addressed to johncoomes@coomeslaw.com.  The information contained in this email was of a nature that was routinely shared with Union members by Crew Scheduling Coordinators, Crew Schedulers, and Managers (**Exhibit 6:** Cameron Aff. ¶ 5).

Now the Company timeline gets a little uncertain.  In "June or July" this "George Email" becomes the cause of a vigorous investigation into…. nothing.  Rose Doria assigned two people from HR to get right on this "outrageous" breach of company policy and security, and then nothing happened.  Even though the HR personnel assigned were not involved in the flight attendant negotiations, nothing was done on this investigation as the summer wore on.

**Retaliatory Trigger #4**

Captain Coomes files a Charge of Discrimination with the EEOC on August 28, 2018.  On August 31, 2018, the Company threatens to fire Captain Coomes again and requests he stop using the johncoomes@coomeslaw.com email address for Pilot Union business (**Exhibit 3:** Coomes Aff. ¶ 16).  The Pilot's Union filed another "boondoggle grievance" in September 2018.  Now the Company is serious.  Rose Doria remembers that there is supposed to be an investigation going on.  She discovers that no one has bothered to investigate the issue of the "George Email".  With the trigger of Coomes filing a charge, Doria commands the HR personnel to commence with the investigation immediately (**Exhibit 16:** Defendant's Position Statement Doria Aff. ¶ 7).  The person in charge of the entire Crew Scheduling department was not involved, and the VP in charge of her was finally brought into the loop in September, even though he had been in charge since July of 2018. (**Exhibit 16:** Defendant's Position Statement Scrobola Aff. ¶ 5).

So, in September of 2018, the investigation is ordered again, but it will not commence until October of 2018.  The "George Email" was not unusual (**Exhibit 6:** Cameron Aff. ¶ 5).

The crack team of investigators who masterminded this effort are no longer employed by the company. **Under the pretense of this investigation, the Company terminated my employment in retaliation for my involvement in the Pat Gannon/Michael Dee investigation and my relationship to John Coomes and his EEOC filing.**

### Similarly Situated Parties

The Company claims an email to an outside third party is comparable to an email sent in the course of ordinary business to another employee of the company. This analysis is flawed on its very face. As Captain Coomes and Brad Cameron state, the content of the email was routinely passed along to Union members who are employees of the company. Also, the content of the email is available to the Union from the exact same source from which crew schedulers get it. **The information shared with the Union was entirely appropriate and has been routinely shared in the past, and not a violation of any Company policy.**

When turning the topic to the levels of discipline meted out to crew schedulers or even coordinators, the disparity in the use of termination in this case is so far outside the norm, my colleagues were as shocked as I was (**Exhibit 6:** Cameron Aff. ¶ 7). Progressive discipline was the policy in practice during my entire career at Republic: **but for my involvement in the Pat Gannon/Michael Dee investigation and my relationship to John Coomes and his EEOC filing, I would not have been fired.**

### Company Claim of Prior Discipline

In the Company's EEOC response, it claims I told a crewmember the wrong report time for eight years in the future (**Exhibit 16**: Defendant's Position Statement p.8, ¶ 7). I assume it is a typo and is referring to a documentation of a mistake I made in 2009. There was no discipline involved. The document was generated to use if the mistake occurred again. Until the day I was suspended, I never made that error again.

The Company also addresses a letter discussing six absences (Id.).  Once again, this letter was merely a notification of the policy regarding eight absences and the possible consequences for eight absences.  The number of absences were inflated due to eye surgery.  No discipline was involved.

The Company then claims a performance review addressing attendance as discipline (Id.).  Once again, a review is not discipline, and I received an above average raise after that review.  Clearly no discipline.

## III    CONCLUSION

I participated in a statutorily protected activity and am the Domestic Partner of John Coomes who also participated in a statutorily protected activity.  Republic Airways terminated me due to my statutorily protected activity and because I am the Domestic Partner of John Coomes, who also participated in a statutorily protected activity.  The Retaliatory Trigger Points discussed above lay out the causal connection between the actions of the Company as a direct result of protected activity and relationship to someone participating in protected activity.  When the repeated suspicious timing of the Company retaliatory actions, is combined with the unsubstantiated and ambiguous claims made regarding "inside information" and the lack of any sense of progressive discipline applied, the metrics laid out by the Seventh Circuit have been met for retaliation under Title VII and Indiana State Law.

My termination was an illegal act of retaliation:

1.  Plaintiff engaged in a statutorily protected activity by assisting a coworker regarding a complaint that falls under the jurisdiction of the EEOC and Title VII.

2.  Plaintiff is a Close Family member of a person who filed an EEOC complaint.

3.  Plaintiff suffered the aforementioned adverse employment actions including termination.

4.  There is a causal connection between the protected activity/status and the adverse action.

5. Plaintiff is entitled to in excess of $2,000,000 in damages.

## SECOND CLAIM FOR RELIEF
### State Law Retaliation-Title VII

6. Plaintiff engaged in a statutorily protected activity by assisting a coworker regarding a complaint that falls under the jurisdiction of the EEOC and Title VII.

7. Plaintiff is a Close Family member of a person who filed an EEOC complaint.

8. Plaintiff suffered the aforementioned adverse employment actions including termination.

9. There is a causal connection between the protected activity/status and the adverse action.

10. Plaintiff is entitled to in excess of $2,000,000 in damages.

## THIRD CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress

11. Plaintiff herby adopts all of the foregoing allegations in the First Claim for Relief.

12. Plaintiff engaged in a statutorily protected activity by filing a charge with the EEOC.

13. As a result of the Defendants' intentional, illegal conduct, the Plaintiff has suffered extreme emotional distress and has incurred substantial monetary damages, including, but not limited to lost wages and the value of job-related benefits, that will continue into the future.

14. There is a causal connection between the Defendant's activity and the adverse action.

15. Plaintiff is entitled to in excess of $2,000,000 in damages.


**WHEREFORE**, Plaintiff Brittanni George, in the First Claim for Relief, demands judgment against Defendant Republic Airline Inc in an amount in excess of $2,000,000. Plaintiff Brittanni George in the Second Claim for Relief, demands judgment against Defendant Republic Airways Inc in an amount in excess of $2,000,000. Plaintiff Brittanni George in the Third Claim for Relief, demands judgment against Defendant Republic Airways Inc in an amount in excess of $2,000,000, and any other relief as may be necessary and proper.

Respectfully submitted,

Brittanni George
4934 Ford St.
Speedway, IN 46224
Tel: (317) 726-6242
bgeorge@coomeslaw.com

# JOHN J. COOMES

### ATTORNEY AT LAW

4934 FORD ST. SUITE #201                                    TELEPHONE (513) 456-4024
SPEEDWAY, IN 46224                                          FAX (513) 297-6015

November 29, 2017

General Counsel
Republic Airline
8909 Perdue Rd., Ste 300
Indianapolis, IN 46268

# FILED

JUN 0 1 2020   (29)

Myla a. Eldridge)
CLERK OF THE MARION CIRCUIT COURT

Re: Notice to Preserve Electronic Evidence

To Whom It May Concern

My law firm will be representing John Coomes in a law suit and potential EEOC investigation in which your company, Republic Airline will be named as a defendant. This letter requests your immediate action to preserve electronically stored information that may contain evidence important to this legal matter. Briefly, the matter involves contractual violations and violations of Federal law on the part of the Company through its agents against Plaintiff Coomes. These agents include but are not limited to Pat Gannon, Paul Kinstedt, Rose Doria, and Michael Dee. The communications of the named agents, that refer or relate to John Coomes, regardless of the recipient or sender, are the focus of this Notice, but that does not negate the broader request if there are documents or other media that refer or relate to Plaintiff Coomes.

This notice applies to Republic Airline's on-site and off-site computer systems and removable electronic media plus all computer systems, services, and devices (including all remote access and wireless devices) used for Republic Airline's overall operation. This includes, but is not limited to, e-mail and other electronic communications; electronically stored documents, records, images, graphics, recordings, spreadsheets, databases; calendars, system usage logs, contact manager information, telephone logs, internet usage files, deleted files, cache files, user information, and other data. Further, this notice applies to archives, backup and disaster recovery tapes, discs, drives, cartridges, voicemail and other data. All operating systems, software, applications, hardware, operating manuals, codes, keys and other support information needed to fully search, use, and access the electronically stored information must also be preserved. The importance of immediate action cannot be overstated. Electronically stored information is easily corrupted, altered, and deleted in normal daily operations. Even booting a drive, running an application, or reviewing a document can permanently alter evidence. An important method for preserving data in its original state is to have a forensic image (mirror image or clone image) made of pertinent hard drives of both office and home computers used for business and of network servers. This image captures all current data, including the background and metadata about each document. Simply copying data to a CD-ROM or other common backup medium is not adequate. For each captured image file, record and identify the person creating the image and the date of creation. Secure the file to prevent subsequent alteration or corruption and create a chain of custody log. Once the forensic data image file is created, the pertinent computer or other device can be placed back into operation. The key persons and their devices would include but are not limited to Pat Gannon, Paul Kinstedt, Rose Doria, Michael Dee, and Shane Tilley.

This preservation notice covers the above items and information between the following dates: January 1, 2015 through the date of this letter and continuing until the conclusion of this matter. Follow the above procedures to preserve electronic information created after this notice. Current law and rules of civil procedure clearly apply to the discovery of electronically stored information just as they apply to other evidence, and confirm the duty to preserve such information for discovery. Republic Airline and your officers, employees, agents, and affiliated organizations must take all reasonable steps to preserve this information until this legal matter is finally resolved. Failure to take the necessary steps to preserve the information addressed in this letter or other pertinent information in your possession or control may result in serious sanctions or penalties. Further, to properly fulfill your preservation obligation, stop all scheduled data destruction, electronic shredding, rotation of backup tapes, and the sale, gift or destruction of hardware. Notify all individuals and affiliated organizations of the need and duty to take the necessary affirmatives steps to comply with the duty to preserve evidence.

Sincerely,

John J. Coomes, Esq.
JohnCoomes@CoomesLaw.com



## U.S. Equal Employment Opportunity Commission
# Public Portal



Welcome John Coomes | Home | Privacy Statement | Log Out

Schedule an Interview    Back to My Cases

## Inquiry Submitted

Your inquiry has been successfully submitted to EEOC. You should write down the inquiry number **470-2018-03161** and refer to it when contacting EEOC.

## Online Scheduling

You are now ready to schedule an interview with an EEOC representative, and will be directed to the scheduling cale the appropriate office when you click "Schedule an Interview" below. You must schedule an appointment through th in order to complete the inquiry process and be interviewed by EEOC staff. If you do not schedule an interview, we take any action on your inquiry. Based on the information you provided, you can schedule an interview at the follow office(s):

Indianapolis District Office

Schedule an Interview    Back to My Cases

Accessibility Statement
For website technical support(only), please contact digitalsupport@eeoc.gov or 1-800-569-7118

<u>AFFIRMATION UNDER OATH OF JOHN COOMES</u>

I, John Coomes, pursuant to 28 U.S.C. § 1746, state and declare under penalty of

perjury as follows:

1. I am over 18 years of age, and competent to testify as to the matters contained herein.

2. I have personal knowledge of all of the information contained herein.

3. I am employed by Republic Airways as a Captain and am a Chief Steward for the Pilots'

   Union.  I previously held the position of Manager of Advanced Qualification Programs.

   In that managerial role, I worked for Alex Osleger and very closely with Krista Murdock,

   Rose Doria, and Tiffane Papillon.  My duties crossed several departments and my

   interface with Mrs. Murdock dealt with crew scheduling issues related to training and

   special projects, as well as my own airline flying.  My interactions with Ms. Doria and

   Ms. Papillon were due to a delegation of labor relation related issues by my supervisor,

   Alex Osleger.

4. Due to my cross-departmental duties, I had managerial level access to several crew

   scheduling software products.  One in particular is called CrewTrac.  This is a powerful,

   but somewhat archaic, system for tracking the schedules and modifications to schedules

   of crewmembers for both revenue and non-revenue flying.  Access to this software is also

   given to select Union members, and as a Chief Steward, I am one of those members.

5. Unfortunately, this archaic software can be a bit troublesome when accessing it remotely.

   Frequently, this would require a quick phone call to The Company's Crew Scheduling

   Department in order to get information on trip pairings or a pilot's schedule.  None of this

   information was different from what I could get from my own login if it was working

   properly.  As a matter of fact, the crew scheduler would use the exact same software to

   provide me the material that I would have been requesting.  Schedulers, Scheduling

Coordinators, and Crew Scheduling Managers have provided this data via screen shots to email, or cell phone pictures via text. I hear this practice is still ongoing, but has transitioned to text messages due to the draconian actions taken against Brittanni George. To be clear, this information is not restricted from the Union. I have my own login to access this material at any time, as long as the technology is working. Any claim to the contrary, is disingenuous, and quite likely only made by an individual due to the company looking over his/her shoulder as he/she writes or answers questions by an interviewer from human resources.

6. I am familiar with former Republic employee Brittanni George. I knew her professionally starting in 2013, and then entered into a romantic relationship with her in 2015. Rose Doria brought this relationship to my supervisor's attention in December 2015. My supervisor was not concerned about the relationship in any way. In conversation, my supervisor mentioned Ms. Doria's concern, and laughed at her fascination with the relationship. My supervisor told me over the next two years that Ms. Doria mentioned the relationship several times. Mrs. Murdock was also surprised at the attention the relationship was receiving. She shared her wisdom concerning giving any appearance of impropriety, and told us of her efforts to do the same with her husband, who is also a pilot for the company.

7. Armed with the certain knowledge that Company Officers were obsessed with our relationship, Ms. George and I went to great lengths to avoid any hint of scandal.

8. In October of 2017, the Company investigated Pat Gannon and Michael Dee for discrimination against several protected classes and other unprofessional behavior. I was interviewed as a witness, and I named Ms. George as a material witness with the specific

content of what her testimony would be. I also informed the Company Counsel, David

Carr, of a potential EEOC filing I was contemplating against the Company based on Pat

Gannon's and the Company's continuous and ongoing discriminatory behavior.

9.  On November 7, 2017, I informed the Company's Counsel, David Carr, via email of a

retaliatory action by Pat Gannon towards me that was witnessed by several company

employees.

10. On November 29, 2017, I sent a Notice to Preserve to Republic and put them on notice of

a potential EEOC claim.

11. In May of 2018, the Pilots' Union became aware of a "boondoggle" flight to Haiti piloted

by Pat Gannon. The source of this information was a dispatcher at the Company. The

flight was common knowledge in the Company. The assignment of this trip violated the

contract. I spoke with another Chief Steward about this latest contract violation, and we

decided to grieve it. When I attempted to pull up the pairing information on CrewTrac, I

was unable to log in. This was not unusual, as the software can be difficult to log into

when operated remotely. Due to this difficulty, I called Crew Scheduling and requested a

screen shot of the pairing be emailed to me. In accordance with the accepted practice of

the time, Ms. George sent me the requested information. Information that I normally had

full access to at the time, and to which I still have full access.

12. According to the Pilot's Contract, Open Flying is required to be published by the

Company in software, accessible to all pilots, called FLICA. This software sends alerts to

pilots, alerting them to open time becoming available. The Company now implies that I

have received "inside" information from Ms. George (Pappillion Aff. ¶8) in order to bid

on Open Time in accordance with the contract. This baseless allegation indicates an

ignorance of the publishing of Open Time and the mechanisms for pilots to bid upon it. Fortunately, FLICA is transparent enough to show the blatant violations of the Pilots' Contract the Company committed on many occasions. The "boondoggle grievances" have been settled now, with the Company agreeing to follow the Contract in the future.

13. In early June of 2018, I initiated an EEOC inquiry and made it known to managerial personnel of the Company.

14. On June 19, 2018, after I initiated an Inquiry with the EEOC, the General Counsel for the Company, Wade Sheek, and VP of HR, Matt Koscal, threatened to fire me in a meeting attended by the General Counsel for the Pilots' Union, Marc Anderson, and me. The Company was displeased with my representation of clients adverse to the Company. Sheek and Koscal specifically mentioned pilots who had left the company. I had been contacted and engaged by those pilots because I am well known to the pilot group as a lawyer due to my union activity and interactions while I am flying the line. My client list is made up of many current flight attendants, schedulers, managers, pilots, and people who have left the company. I have even represented the offspring of a corporate officer. None of these clients have been referred to me by Ms. George, nor would I think she would have any referrals to give.

15. On August 28, 2018, I was able to file a charge of discrimination with the EEOC and made it known to managerial personnel of the Company. There had been a tremendous backlog for appointments with the agency, which led to the extended timeline.

16. On August 31, 2018, the General Counsel for the Company, Wade Sheek, and VP of Labor Relations, Rose Doria, threatened to fire me in a meeting attended by the General Counsel for the Pilots' Union, Marc Anderson, and me. A letter was read to me and

provided to me in hard copy.  In that meeting, Rose Doria requested that I cease using my email address johncoomes@coomeslaw.com for any communication with the company. Up to that time, that address was the only address I used for all of my union and most of my personal email traffic, simply for efficiency.  Having one email inbox, was much simpler than having many.  At that meeting I agreed to stop using that address when conducting Pilot Union business, but since I was the General Counsel for the Dispatchers' Union, I would continue to use johncoomes@coomeslaw.com for that role. The request was amicably received by me and my response to the Company was received in the same manner. I have included several emails at the end of this document that show the Company managers sending information to this email address.

17. In December of 2018, I filed a lawsuit against the Company for Hostile Work Environment, Discrimination for Age, Gender and Sexual Orientation, and Negligent Retention.

18. This lawsuit just recently survived a Motion for Summary Judgement, is scheduled for a discovery conference on November 15, 2019, and was amended to include a claim the Company has retaliated against me due to my EEOC filing.

19. The following pages are the emails discussed in paragraph 16 and screen shots representative of information that I was authorized to view in May of 2018, and am still authorized to view.  My signature page will follow the screen shots.

FURTHER, AFFIANT SAITH NOT.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS

TRUE AND CORRECT.

Date   11/4/19

John Coomes

# REPUBLIC
## AIRWAYS

August 31, 2018

**VIA E- MAIL AND HAND DELIVERY**

Mr. John Coomes
John.Coomes@rjet.com

Dear Mr. Coomes,

I am writing regarding your legal representation of former Republic Airline Inc. ("Republic" or the "Company") employees in matters adverse to the Company. You specifically have stated that your law firm has been "engaged to represent" individuals from whom Republic seeks repayment of outstanding signing bonuses and that you and your clients "dispute[] the validity of this debt." As we have discussed previously, this legal representation constitutes a conflict of interest and thus violates Republic's Code of Conduct, which contains an express prohibition on external employment that creates a conflict of interest.

As you know, the Republic Code of Conduct provides that "Company Associates, at all levels, are expected to loyally promote all legitimate interests of the Company. Therefore, each Associate has an obligation to refrain from activities which might have an adverse effect upon the Company or may interfere with an Associate's independent exercise of his or her best judgment in furtherance of the Company's best interest. In particular, corporate funds, materials, supplies, proprietary or inside information, or other resources shall not be used in any way to advance an Associate's personal business, financial, or other interests. Business dealings that appear to create a conflict between the interests of the Company and an Associate are unacceptable." The Code of Conduct further states that "[t]he Company has no objection to Associates working at more than one job outside the Company, providing the other job(s) does not ... create a conflict of interest..." and "*[i]f it is determined that a conflict of interest exists for a current Associate, the Company will require that the Associate either resign from the Company or resign from the other employer.*" (Emphasis added.)

Here, your legal representation of former employees in matters adverse to the Company constitutes a conflict of interest, providing you with personal financial gain to the detriment of the Company. You also did not disclose this conflict of interest to the Company prior to accepting legal representation of the Company's former employees in these matters. Moreover, this conflict of interest is exacerbated by the fact that, as a pilot employed by Republic, you have access to non-public information that would not be available to an attorney who is not employed by Republic.

Although you are free to represent whomever you wish as an attorney including former employees in matters adverse to the Company, you may not do so while you are employed by the Company because it

creates a conflict of interest in violation of the Code of Conduct. As a result, should you accept any future legal representation of individuals in matters adverse to the Company, the Company will terminate your employment consistent with the Code of Conduct.

Very truly yours,

Wade Sheek
Vice President, General Counsel & Secretary

Brittanni George
4934 Ford St.
Speedway, IN 46224

December 31, 2018

General Counsel
Republic Airline
8909 Purdue Rd., Ste 300
Indianapolis, IN 46268

Re: Notice to Preserve Electronic Evidence

To Whom It May Concern

I will be representing myself in a law suit and potential EEOC investigation in which your
company, Republic Airline, will be named as a defendant. This letter requests your immediate
action to preserve electronically stored information that may contain evidence important to this
legal matter. Briefly, the matter involves violations of Federal law on the part of the Company
through its agents against me.  These agents include but are not limited to Pat Gannon, Paul
Kinstedt, Rose Doria, Matt Koscal and Michael Scrobola.  The communications of the named
agents, that refer or relate to me, regardless of the recipient or sender, are the focus of this
Notice, but that does not negate the broader request if there are documents or other media that
refer or relate to me.

This Notice applies to Republic Airline's on-site and off-site computer systems and removable
electronic media plus all computer systems, services, and devices (including all remote access
and wireless devices) used for Republic Airline's overall operation. This includes, but is not
limited to, e-mail and other electronic communications; electronically stored documents, records,
images, graphics, recordings, spreadsheets, databases; calendars, system usage logs, contact
manager information, telephone logs, internet usage files, deleted files, cache files, user
information, and other data. Further, this Notice applies to archives, backup and disaster
recovery tapes, discs, drives, cartridges, voicemail and other data. All operating systems,
software, applications, hardware, operating manuals, codes, keys and other support information
needed to fully search, use, and access the electronically stored information must also be
preserved. The importance of immediate action cannot be overstated. Electronically stored
information is easily corrupted, altered, and deleted in normal daily operations. Even booting a
drive, running an application, or reviewing a document can permanently alter evidence. An
important method for preserving data in its original state is to have a forensic image (mirror
image or clone image) made of pertinent hard drives of both office and home computers used for
business and of network servers. This image captures all current data, including the background
or metadata about each document. Simply copying data to a CD-ROM or other common backup
medium is not adequate. For each captured image file, record and identify the person creating the
image and the date of creation. Secure the file to prevent subsequent alteration or corruption and
create a chain of custody log. Once the forensic data image file is created, the pertinent computer
or other device can be placed back into operation. The key persons and their devices would
include but are not limited to Pat Gannon, Paul Kinstedt, Rose Doria, Matt Koscal and Michael
Scrobola.

This preservation Notice covers the above items and information between the following dates:
January 1, 2017 through the date of this letter and continuing until the conclusion of this matter.
Follow the above procedures to preserve electronic information created after this Notice. Current
law and rules of civil procedure clearly apply to the discovery of electronically stored
information just as they apply to other evidence, and confirm the duty to preserve such

information for discovery. Republic Airline and your officers, employees, agents, and affiliated organizations must take all reasonable steps to preserve this information until this legal matter is finally resolved. Failure to take the necessary steps to preserve the information addressed in this letter or other pertinent information in your possession or control may result in serious sanctions or penalties. Further, to properly fulfill your preservation obligation, stop all scheduled data destruction, electronic shredding, rotation of backup tapes, and the sale, gift or destruction of hardware. Notify all individuals and affiliated organizations of the need and duty to take the necessary affirmatives steps to comply with the duty to preserve evidence.

Sincerely,


Brittanni George
Brit437@gmail.com

## AFFIRMATION UNDER OATH OF BRAD CAMERON

I, Brad Cameron, pursuant to 28 U.S.C. § 1746, state and declare under penalty of

perjury as follows:

1. I am over 18 years of age, and competent to testify as to the matters contained herein.

2. I have personal knowledge of all of the information contained herein.

3. I was employed by Republic Airways for over nine years as a Crew Scheduler and

   subsequently as a Crew Scheduling Coordinator.  I just recently resigned in August 2019

   for personal reasons. A Coordinator position is in the Company's crew scheduling

   department, but is in a higher pay bracket than Crew Schedulers, is in charge of a shift,

   works with dispatch and delegates issues as needed to Crew Schedulers. Coordinators

   hold a slightly higher authority level than Crew Schedulers.

4. During the course of my duties, I would occasionally receive inquiries from the Chief

   Stewards regarding pilot's schedules and I would provide that information electronically

   and verbally without hesitation.  While I knew these Chief Stewards had access to the

   same scheduling software I had, I also recognized the difficulty of utilizing that software

   while the Chief Stewards, who are all pilots for the airline, were traveling.  I never

   thought this information transfer to be improper because it was not being forwarded to

   any party not authorized to have the information.

5. I am aware that other Coordinators, Crew Schedulers, and Managers also provided

   similar information both electronically and orally to Chief Stewards without hesitation,

   just as I had.

6. I am familiar with former Republic employee Brittanni George. I knew her professionally

   my entire career at Republic.  I was aware of her relationship with John Coomes, who is a

   Captain for the airline and a Chief Steward for the Pilot's Union.  At no time did I ever

observe or hear of Ms. George giving Captain Coomes any preferential treatment, nor did I ever observe or hear of her giving him "inside information". Every action I observed by Ms. George in the execution of her job responsibilities, was both professional and in compliance with the best practices of the department. In fact, her problem-solving skills made her one of the best Coordinators in the department.

7. During the course of my career at the airline, I had the opportunity to witness a variety of misdeeds committed by coworkers in the crew scheduling department. I was frequently surprised at the mild form of progressive discipline utilized to correct egregious behavior. Termination was always a last and final step after numerous opportunities to correct bad behavior. So, when the company fired Ms. George for sharing information that was routinely transferred to Pilot Union Stewards, I was shocked. As a matter of fact, the entire department was shocked. This discipline was not in the tradition of progressive discipline, and even more distressing for all of us, this discipline was for behavior that was ordinary and usual in the course of our everyday business.

8. Many of my coworkers and I discussed amongst ourselves the circumstances of Ms. George's sudden firing. The overriding opinion is that it must have been an effort to get back at Captain Coomes for either his union activities or his lawsuits against the company.

FURTHER, AFFIANT SAITH NOT.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Date: __10/30/2019__          _____

                                          Brad Cameron

Exhibit 7

## Coomes, John J

| | |
|---|---|
| **From:** | Carr, David J.  <David.Carr@icemiller.com> |
| **Sent:** | Wednesday, November 8, 2017 4:00 PM |
| **To:** | Coomes, John |
| **Subject:** | RE: [EXT] RAH Workplace Investigation |

John—Thanks for the prompt response.  I will keep you apprised, and hope you will do the same.  Best Regards, DJC

**From:** Coomes, John [mailto:John.Coomes@rjet.com]
**Sent:** Wednesday, November 08, 2017 3:58 PM
**To:** Carr, David J.
**Subject:** [EXT] RAH Workplace Investigation
**Importance:** High

David, I appreciate your collegial rebuke.  I assure you that I have been nothing but circumspect in my behavior concerning this investigation.  I would imagine the party that alleged any open discussion by me, is the same party that is behaving in a retaliatory manner towards me.  I would be happy to address any specific allegations at your convenience.

Best regards,
John

**From:** Carr, David J. [mailto:David.Carr@icemiller.com]
**Sent:** Wednesday, November 8, 2017 8:52 AM
**To:** Coomes, John <John.Coomes@rjet.com>
**Subject:** RE: [EXT] Retaliatory behavior--RAH Workplace Investigation

John:  Thanks for sharing this information with me, and it will be included in my report.  As a lawyer, I am sure you can appreciate the value in keeping my investigation as confidential as possible.  It was reported to me that you were openly talking about the investigation with other employees, and taking bets on how soon Mr. Gannon would be fired.   If true, this is unhelpful.   Please keep me posted on any additional developments.  Best Regards, DJC

**From:** Coomes, John [mailto:John.Coomes@rjet.com]
**Sent:** Tuesday, November 07, 2017 3:30 PM
**To:** Carr, David J.
**Subject:** [EXT] Retaliatory behavior
**Importance:** High

David, I hope this message finds you well.  Unfortunately, I find myself in a position that requires a notification to you.  Pat Gannon has acted in a retaliatory manner towards me in public directly related to my participation in your investigation.  This was in front of the chief pilot, director of crew scheduling, director of safety, and a crew scheduling coordinator.  He accused me of trying to get "more ammunition that I would use against" him, declared that I was motivated by a desire to have his job, stated that I would record things that he said and use it against him, and that I had made a wager concerning his future employment status.

His behavior was outrageous, embarrassing for all people present, and was undeniably in response to my participation in the investigation.  On a related note, I have an outstanding application for job that reports to him that has been active since August (Program Manager).  I am imminently qualified for the position, but have not been contacted since I

applied in August.  I believe this lack of interest in a well-qualified candidate is again directly attributable to my participation in the investigation of Pat.   I am available if you have any further questions.  Take care.

John Coomes, Esq.
MIA Captain
513.607.4669 Cell
John.Coomes@RJet.com

**********************************************************************************************
******************************************************************
CONFIDENTIALITY NOTICE: This E-mail and any attachments are confidential and may be protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of this E-mail or any attachment is prohibited. If you have received this E-mail in error, please notify us immediately by returning it to the sender and delete this copy from your system.
Thank you.
ICE MILLER LLP
**********************************************************************************************
******************************************************************

CM/ECF LIVE

Exhibit 8

## Notices
1:19-cv-00034-TWP-MPB
COOMES v. REPUBLIC AIRLINE
INC.

ProSeCH,PROSE

**U.S. District Court**
**Southern District of Indiana**
**Office of the Clerk**
**(317)229-3700**
www.insd.uscourts.gov

## Notice of Electronic Filing

The following transaction was entered on 10/10/2019 at 10:49 AM EDT and filed on 10/10/2019

**Case Name:**     COOMES v. REPUBLIC AIRLINE INC.
**Case Number:**   1:19-cv-00034-TWP-MPB
**Filer:**
**Document Number:** 18(No document attached)

**Docket Text:**
**NOTICE of Teleconference Call-in Information for [17] Initial Telephonic Pretrial Conference set for 11/15/2019 at 02:30 PM (Eastern Time) before Magistrate Judge Matthew P. Brookman. Parties are to call 888-675-2535 to participate in the conference. Callers will be required to enter Access Code 6191969 and Security Code 1934 before being connected to the conference call.. (TEXT-ENTRY: There is no pdf document associated with this entry.) (TMB)**

**1:19-cv-00034-TWP-MPB Notice has been electronically mailed to:**

David J. Carr    david.carr@icemiller.com, Diane.Clancey@icemiller.com, ross@icemiller.com

Paul Conrad Sweeney    paul.sweeney@icemiller.com, Diane.Clancey@icemiller.com, Janie.Ross@icemiller.com

**1:19-cv-00034-TWP-MPB Notice has not been electronically mailed to:**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JOHN COOMES,                            )
                                        )
                Plaintiff,              )
                                        )
        v.                              )       No. 1:19-cv-00034-TWP-MPB
                                        )
REPUBLIC AIRLINE INC.,                  )
                                        )
                Defendant.              )

## ORDER SETTING PRO SE INITIAL PRE-TRIAL CONFERENCE

The parties are ORDERED to appear **TELEPHONICALLY** for an initial pre-trial conference in this case, on **FRIDAY, NOVEMBER 15, 2019 AT 2:30 P.M. (EST),** before Magistrate Judge Matthew P. Brookman. **The information needed by parties to participate by telephone will be provided by a separate notification.**

One of the first things that the Court will ask the Plaintiff to do at the conference is to briefly explain what the lawsuit is about. That means that the Plaintiff must be prepared to tell the Court what his or her case is about and how each Defendant was involved. Afterward, the Court will ask the Defendant(s) to briefly explain its defenses.

Once the parties have explained what the case is about, the Court will ask the parties if there is any reason that the Court should not enter the following orders in the case:

A. No later than **DECEMBER 2, 2019** – Each party must give the other parties a list (with addresses and telephone numbers) of every witness who has knowledge that could help prove that party's claims or defenses. For each witness the party lists, there should be a brief description of what that witness knows.   **This list is NOT filed with the Court.

B. No later than **DECEMBER 2, 2019** – Each party must give the other parties copies of all documents, computer files, and other electronic data that the party

has that it may use to prove its case.  **The copies of documents are NOT filed with the Court.

C.  No later than **DECEMBER 2, 2019** – The Plaintiff must give the Defendant(s) a written estimate of how much money the Plaintiff claims he is entitled to for any injuries or damages the Plaintiff claims to have suffered.  At that time, the Plaintiff must also give the Defendant(s) all non-privileged documents that support that estimate, including those that might prove the nature and the extent of the Plaintiff's injury.  **This estimate and the documents are NOT filed with the Court.

D.  The parties must update the information and documents that they provided to each other under Paragraphs A-C above as additional information becomes available to them. The Court may prevent a party from using evidence that it has not shared with the other side.

E.  If parties need additional evidence from each other, or from third-parties, companies, or entities, they may use the methods described in Federal Rules of Civil Procedure 27-36 and 45 to obtain it. These methods are called "discovery" methods.  All discovery requests must be served on the responding party (but NOT filed with the Court) no later than **MARCH 16, 2020.**

F.  No later than **JANUARY 15, 2020** – Each party must tell the other parties if it intends to use any testimony by expert witnesses. At that time, if a party intends to use an expert, it must give the other party a signed report from the expert that presents all the witness' opinions and all the other information required by Federal Rule of Civil Procedure 26(a)(2).  Thirty days later, the other side must file a report by any rebuttal expert.

G.  No later than **DECEMBER 3, 2019** – Any party who wants to amend its Complaint, Answer, or other pleading must file a motion requesting permission to do so.  This includes trying to add new parties to the suit.

H.  No later than **DECEMBER 9, 2019** – Any party who believes that the pleadings either are improper under Federal Rule of Civil Procedure 12(b) or establish (non)liability under 12(c) must file a motion to that effect.

I.  No later than **APRIL 15, 2020**– Any party who believes that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, and therefore the case does not need to go to trial, must file its motion

under Federal Rule of Civil Procedure 56.

J.  On a date and time to be determined, the parties shall appear in person for a settlement conference. Each party must submit a confidential settlement statement to chambers at least three business days before the settlement conference. **This is the **only** exception to the rule that parties cannot give papers to the Court without also giving them to the other side.

K.  If the case is not resolved by settlement, motion, or other ruling, the court will set a trial date.

L.  Information for pro se individuals (those representing themselves without an attorney) may be found on the Court's website at www.insd.uscourts.gov.


SO ORDERED:

Date: October 9, 2019

_Matthew P. Brookman_
Matthew P. Brookman
United States Magistrate Judge
Southern District of Indiana


Distribution:

JOHN COOMES
4934 Ford Street
Speedway, IN 46224

David J. Carr
ICE MILLER LLP (Indianapolis)
david.carr@icemiller.com

Paul Conrad Sweeney
ICE MILLER LLP (Indianapolis)
paul.sweeney@icemiller.com

3

---

**johncoomes@coomeslaw.com**

---

**From:**        Lombardo, Anthony R <Anthony.Lombardo@rjet.com>
**Sent:**        Tuesday, August 14, 2018 10:42 AM
**To:**          John Coomes, Esq.; CPO@rjet.com; chiefstewards@local357.org
**Cc:**          Chief Stewards
**Subject:**     RE: Signature

Yep, we will.

**From:** John Coomes, Esq. <johncoomes@coomeslaw.com>
**Sent:** Tuesday, August 14, 2018 10:39 AM
**To:** CPO@rjet.com; chiefstewards@local357.org
**Cc:** Chief Stewards <chiefstewards@local357.org>
**Subject:** Signature

Thank you for reaching out to him. I would also like to request a signature when using the generic email address. I think we have discussed this in previous email strings. Thanks!


John Coomes, Esq.
513.607.4669 Cell
JohnCoomes@CoomesLaw.com

-------- Original message --------
From: CPO@rjet.com
Date: 8/14/18 08:26 (GMT-06:00)
To: Coomes Law <johncoomes@coomeslaw.com>, CPO@rjet.com
Cc: Chief Stewards <chiefstewards@local357.org>
Subject: RE: Hotel in base


Just as a heads up I will be calling Shawn to explain this. He was not owed the hotel in base as the reassignment took place as a result of his commute call off. That was not the intent of the reassignment language. We can discuss it further tomorrow during the meeting.


**From:** Coomes Law <johncoomes@coomeslaw.com>
**Sent:** Saturday, August 11, 2018 7:14 PM
**To:** CPO@rjet.com
**Cc:** Chief Stewards <chiefstewards@local357.org>; Williams, Shawn A <Shawn.Williams2@rjet.com>
**Subject:** FW: Hotel in base


Can someone address this issue with the pilot please? He was reassigned and had an overnight in base. Per the contract, a hotel should have been provided. Thank you.

John Coomes, Esq.

513.456.4024 Office

513.607.4669 Cell

JohnCoomes@CoomesLaw.com

Notice: This transmission is intended for the sole use of the individual(s) and entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution, or duplication of this transmission by someone other than the intended addressee or its designated agent is strictly prohibited. ANY unauthorized and prohibited interception, distribution, or forwarding of this email will be considered in violation of the Wiretap Act, 18 U.S.C. SS 2510-2520, and the Stored Communications Act, 18 U.S.C. SS 2701-2710

**From:** Williams, Shawn A <Shawn.Williams2@rjet.com>
**Sent:** Thursday, August 9, 2018 3:02 PM
**To:** John Coomes, Esq. <johncoomes@coomeslaw.com>
**Subject:** Re: Hotel in base

Hey John, I have still heard nothing from the CPO. Isn't a little strange to have no response after this many days? Did I send it to the wrong address?? Lol

Sent from my iPhone

> On Aug 6, 2018, at 6:37 PM, Coomes Law <johncoomes@coomeslaw.com> wrote:
>
> If you do not receive a response by tomorrow, please let me know.
>
> John Coomes, Esq.
>
> 513.456.4024 Office
>
> 513.607.4669 Cell
>
> JohnCoomes@CoomesLaw.com

Notice: This transmission is intended for the sole use of the individual(s) and entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution, or duplication of this transmission by someone other than the intended addressee or its designated agent is strictly prohibited. ANY unauthorized and prohibited interception, distribution, or forwarding of this email will be considered in violation of the Wiretap Act, 18 U.S.C. SS 2510-2520, and the Stored Communications Act, 18 U.S.C. SS 2701-2710

**From:** Williams, Shawn A <Shawn.Williams2@rjet.com>
**Sent:** Monday, August 6, 2018 6:34 PM
**To:** Coomes Law <johncoomes@coomeslaw.com>
**Cc:** stewards@local357.org
**Subject:** Re: Hotel in base

No response yet.

Shawn

Sent from my iPhone

On Aug 6, 2018, at 6:30 PM, Coomes Law <johncoomes@coomeslaw.com> wrote:

> Shawn, have you had a response to this from the CPO?

> John Coomes, Esq.

> 513.456.4024 Office

> 513.607.4669 Cell

> JohnCoomes@CoomesLaw.com

3

Notice: This transmission is intended for the sole use of the individual(s) and entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution, or duplication of this transmission by someone other than the intended addressee or its designated agent is strictly prohibited. ANY unauthorized and prohibited interception, distribution, or forwarding of this email will be considered in violation of the Wiretap Act, 18 U.S.C. SS 2510-2520, and the Stored Communications Act, 18 U.S.C. SS 2701-2710

**From:** Williams, Shawn A
<Shawn.Williams2@rjet.com>
**Sent:** Monday, August 6, 2018 9:18 AM
**To:** CPOsupport <CPOsupport@rjet.com>
**Cc:** stewards@local357.org
**Subject:** Hotel in base

Good morning,
This is FO Shawn Williams 606445. On the night of Aug. 1st my radiator and water pump went out in my car resulting in a commuter call out on my 4day trip on Aug. 2nd. After the repairs I called scheduling on Aug. 3rd to be dead headed to MSP to return to my trip, instead I was dead headed to JAX to do 1 leg of a MCI trip the next day. My 4 day turned into a 2 day followed by a 1 day resulting in me having to get a hotel room in base because scheduling said because the reassignment was a result of my commuter call they couldn't get me a room. I was wondering if I could be reimbursed the $88 for my hotel room?

Here are some more details of my communications with scheduling and references to the contract. At 8:54am on Aug. 3rd I called scheduling to be put back on my trip. 12:46pm Aug. 3rd called scheduling for a hotel and was told they couldn't. 6:08am Aug. 4th tried again for a hotel but couldn't. 6.K.6 of the contract states Any lineholder who is Reassigned resulting in an overnight in base shall be provided a hotel room. It does not say that if the Reassignment is because of a commuter call they are not entitled. 6.M.1 of the contract defines a

4

Reassigment as a change to the awarded or assigned
trip. It does not specify why the change occurred.

Can you please look into this? Thank you for your
time and have a great day!
Shawn

**johncoomes@coomeslaw.com**

| | |
|---|---|
| **From:** | Pappillion, Tiffane <Tiffane.Pappillion@rjet.com> |
| **Sent:** | Wednesday, August 8, 2018 2:25 PM |
| **To:** | Coomes Law; crewassist |
| **Cc:** | stewards@local357.org |
| **Subject:** | RE: Leg by Leg Protection |
| | |
| **Flag Status:** | Flagged |

HI John- I spoke with Alem and she knows that protection is leg by leg. Outside of the conversation they had, it appears that this has been pay protected correctly.
Thanks

-----Original Message-----
From: Coomes Law <johncoomes@coomeslaw.com>
Sent: Tuesday, August 7, 2018 1:12 PM
To: Pappillion, Tiffane <Tiffane.Pappillion@rjet.com>; crewassist <crewassist@rjet.com>
Cc: stewards@local357.org
Subject: Leg by Leg Protection

Good afternoon.  Trevor White was told by Alem that he is only protected on a day by day basis.  3.E.1, 3.E.4, and 3.F calls for leg by leg protection.
Trevor was notified of each change and should be pay protected for the greater of notified or flown.  The trip in question is attached.  Please let me know if we are missing something from this side.

John Coomes, Esq.
513.456.4024 Office
513.607.4669 Cell
JohnCoomes@CoomesLaw.com

Notice: This transmission is intended for the sole use of the individual(s) and entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law.
You are hereby notified that any dissemination, distribution, or duplication of this transmission by someone other than the intended addressee or its designated agent is strictly prohibited. ANY unauthorized and prohibited interception, distribution, or forwarding of this email will be considered in violation of the Wiretap Act, 18 U.S.C. SS 2510-2520, and the Stored Communications Act, 18 U.S.C. SS 2701-2710

-----Original Message-----
From: Trevor White <tawru@msn.com>
Sent: Tuesday, August 7, 2018 12:38 PM
To: stewards@local357.org
Subject: T White 607307 cx pay issue

To whom it may concern: I am requesting some help with this pay issue.
On July 22nd we timed out in EWR and were not able to complete our last leg EWR-DFW. Therefore I was sent to a hotel in EWR and was reassigned to dh EWR-DFW the next morning and then we were scheduled to complete our original awarded two legs DFW-EWR and EWR-BUF and I was notified by scheduling of this change. This change would have raised my daily credit to just over 8 hours for the day. When we landed in DFW my FA told me that our legs had been

1

cancelled so I called scheduling to inquire and was then told that the original two legs had been cancelled due to wx and that we were to repo the plane directly to BUF from DFW.

When I called crew pay to inquire as to why I was not getting pay protected leg by leg, Alem proceeded to tell me that we are only protected for the total of the day and since my dh and repo was higher than the original two legs that was all I was going to get paid for.

The screen shot from flica shows my return to gate in RDU but not the rest of the crazy night nor the dh to DFW but my original award for the 23rd and of course the screen shot from crew pay view shows their final pay process.

I was under the impression that we get pay protected leg by leg so since I was assigned to dh and work my original two legs I feel I should get the dh pay and then pay protected for my original pairing instead of the repo.

Thanks, Trevor White 607307

Exhibit 12

**johncoomes@coomeslaw.com**

| | |
|---|---|
| **From:** | Murdock, Krista R <Krista.Murdock@rjet.com> |
| **Sent:** | Wednesday, July 18, 2018 3:05 PM |
| **To:** | johncoomes@coomeslaw.com |
| **Cc:** | Gannon, Patrick D |
| **Subject:** | RE: Crew Life Addition |

Hi John.  I have updated crew life with the information.  Please review it and let me know if you have any questions.

Thank you,

Krista Murdock
**Director, Crew Scheduling ✈ Republic Airline**
(317) 484-6064
Krista.Murdock@RJet.com

**From:** johncoomes@coomeslaw.com <johncoomes@coomeslaw.com>
**Sent:** Wednesday, July 18, 2018 2:11 PM
**To:** Murdock, Krista R <Krista.Murdock@rjet.com>
**Cc:** Gannon, Patrick D <PGannon@rjet.com>
**Subject:** Crew Life Addition

Happy Wednesday Krista!

I am writing to ask for some additional information to be added to the Union page in the Crew Life Directory.  We discussed this with Pat today in the ops meeting, and he had no objections.

We would like to add the following:

Steward on Duty
Call 855-357-0357
Stewards@local357.org

Please let me know if you have any questions.  Thanks!

John Coomes, Esq.
513.456.4024 Office
513.607.4669 Cell
JohnCoomes@CoomesLaw.com

Notice: This transmission is intended for the sole use of the individual(s) and entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution, or duplication of this transmission by someone other than the intended addressee or its designated agent is strictly prohibited. ANY unauthorized and prohibited interception, distribution, or forwarding of this email will be considered in violation of the Wiretap Act, 18 U.S.C. SS 2510-2520, and the Stored Communications Act, 18 U.S.C. SS 2701-2710

Exhibit 13

## johncoomes@coomeslaw.com

| | |
|---|---|
| **From:** | johncoomes@coomeslaw.com |
| **Sent:** | Tuesday, May 29, 2018 2:26 PM |
| **To:** | 'George, Brittanni P' |
| **Subject:** | RE: haiti. |

Thanks!

John Coomes, Esq.
513.456.4024 Office
513.607.4669 Cell
JohnCoomes@CoomesLaw.com

Notice: This transmission is intended for the sole use of the individual(s) and entity to which it is addressed, and may contain information that is privileged, confidential, and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution, or duplication of this transmission by someone other than the intended addressee or its designated agent is strictly prohibited. ANY unauthorized and prohibited interception, distribution, or forwarding of this email will be considered in violation of the Wiretap Act, 18 U.S.C. SS 2510-2520, and the Stored Communications Act, 18 U.S.C. SS 2701-2710

**From:** George, Brittanni P.<BGeorge@rjet.com>
**Sent:** Tuesday, May 29, 2018 2:25 PM
**To:** johncoomes@coomeslaw.com
**Subject:** haiti.





**Master Schedule History**

File   Help

Employee ID: 801063   -or-   Name: GANNON, PATRICK DAVIS   ▼   Period: MAY18 ▼

| Trans | Description | Pairing | From Date | Time | To Date | Time | Credit | Pos | By | Date | Time |
|-------|-------------|---------|-----------|------|---------|------|--------|-----|-----|------|------|
| ADV | Notified of Change | I7D14A | 05/29/18 | | | | 0:00 | CA | 610839 | 05/28/18 | 14:15 |
| MMM | Modified Pairing | I7D14 | 05/18/18 | 06:15 | | 21:25 | 9:48 | CA | 803057 | 05/15/18 | 07:29 |
| OFC | OFFICE DUTY | OFC | 05/31/18 | 10:00 | 05/31/18 | 17:00 | 0:00 | CA | 803057 | 05/14/18 | 15:32 |
| ADD | Assign Pairing | I7D14 | 05/29/18 | 06:15 | 05/30/18 | 20:30 | 9:34 | CA | 803057 | 05/14/18 | 15:32 |
| RRD | Remove Reserve Day | OFC | 05/29/18 | 08:00 | 05/29/18 | 17:00 | 0:00 | CA | 803057 | 05/14/18 | 15:32 |
| RRD | Remove Reserve Day | OFC | 05/30/18 | 08:00 | 05/30/18 | 17:00 | 0:00 | CA | 803057 | 05/14/18 | 15:32 |
| RRD | Remove Reserve Day | OFC | 05/31/18 | 08:00 | 05/31/18 | 17:00 | 0:00 | CA | 803057 | 05/14/18 | 15:32 |
| ADV | Notified of Change | I7A35B | 05/07/18 | | | | 0:00 | CA | 803057 | 04/27/18 | 17:05 |
| MMM | Modified Pairing | I7A35A | 05/07/18 | 14:51 | | 21:45 | 14:50 | CA | 803057 | 04/27/18 | 17:03 |
| ADV | Notified of Change | RRD | 05/07/18 | | | | 0:00 | CA | 803057 | 04/27/18 | 17:02 |
| ADV | Notified of Change | RRD | 05/08/18 | | | | 0:00 | CA | 803057 | 04/27/18 | 17:02 |
| ADV | Notified of Change | RRD | 05/09/18 | | | | 0:00 | CA | 803057 | 04/27/18 | 17:02 |
| MMM | Modified Pairing | I7A35 | 05/07/18 | 18:28 | | 21:45 | 14:50 | CA | 803057 | 04/27/18 | 17:02 |
| ADD | Assign Pairing | I7A35 | 05/07/18 | 18:28 | 05/10/18 | 00:05 | 14:50 | CA | 803057 | 04/27/18 | 17:00 |

39 items - Press F1 for help

---

Ⓢ Inquire - I7D14A 05/29/18

File   Edit   View   Configure   Help

Pairing: I7D14A   From: 05/29/18   Thru: 05/29/18   Freq: 2   Exception Date(s):

Positions:   CA 1   FO 0   FA 0   TF 0

Local Times ▼ | Latest/Actual Times ▼   ● Normal   ○ Compact   24:00 ⬍

| Line | Day | Date | OA | Flight # | Dhd | Org | Dst | Dept | Arr. | Block | Credit | Drop/PU | Pos | Eq |
|------|-----|------|-----|----------|-----|-----|-----|------|------|-------|--------|---------|-----|-----|
| ▶ 1 | Tu | 05/29/18 | | 9900 | | IND | PAP | 07:07 | 11:27 | 04:20 | 04:20 | | | 76 |
| 2 | Report 05/29/18 @ 06:15 (IND)  Release 11:42/29 (PAP)  Duty 05:27 FDP(1) 05:12 | | | | | | | | | 04:20 | 04:20 | Dhd 00:00 | Pay 04:20 |
| 3 | We | 05/30/18 | | 9900 | | PAP | IND | 16:50 | 21:10 | 04:20 | 04:20 | | | 76 |
| 4 | Report 05/30/18 @ 16:05 (PAP)  Release 21:25/30 (IND)  Duty 05:20 FDP(1) 05:05 | | | | | | | | | 04:20 | 04:20 | Dhd 00:00 | Pay 04:20 |

Totals   Trip Rig 01:08   08:40   09:48   Dhd 00:00   Pay 09:48

Exceptions   Crew   Comments   Hotel   Hide Drops   Evaluate

Press F1 for help

3

Flight Locator/Crew

File   Help                                                                                                    Sabre

Flight # 9900   Departure Date 05/29/18   Departure City IND   Arrival City PAP

| Pos | Dhd | Pairing | Employee ID | Last Name | First Name | Sen # | Languages | Commuter | Hotel |
|-----|-----|---------|-------------|-----------|------------|-------|-----------|----------|-------|
| CA | | I7D14A / 29 | 801063 | GANNON | PATRICK | | | | |
| FO | | P7124B / 27 | 609230 | DEHOFF | MAURICE | 03958 | | | |
| FA | | R7E97 / 28 | 611932 | HOFFMAN | DEBORAH | 08970 | | | |
| FA | | P7D99A / 28 | 612546 | SHUKAIR | SHADIA | 09181 | | | |
| CA | D | L7H14B / 28 | 802324 | KELLEY | GERALD | 01029 | | | |
| FA | D | L7H12A / 28 | 613039 | DEVLIN | KIMBRA | 09439 | | Yes | |
| FA | D | L7H15A / 28 | 612676 | GARRETT | MORANDAH | 09254 | | | |

7 items - Press F1 for help

4





**Schedule - JOHN COO...**

File   View   Actions   Times   Configure   Help                    Sabre | Airline Solutions

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 27 | 28 | 29 | 30 | 31 | 11/1 | 2 |
|  | I7143 0613 | I1108 |  |  | I7004A 0606 |  |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| <<< 2243 |  | I7643 0510 | 2049 |  |  |  |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |

**Inquire - I7143 10/28/19**

File   Edit   View   Configure   Help                    Sabre | Airline Solutions

Pairing: I7143   From: 10/28/19   Thru: 10/28/19   Freq: 1   Exception Date(s):

Positions:  CA 1   FO 1   FA 0   TF 0

Local Times ▾  Latest/Actual Times ▾   ○ Normal  ○ Compact  24:00 ▲▼

| Line | Day | Date | OA | Flight # | Dhd | Org | Dst | Dept | Arrv | Block | Credit | Drop/PU | Pos | Eqpt | Reg | Tail | Turn |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▶ 1 | Mo | 10/28/19 |  | 4513 |  | IND | MIA | 06:55 | 09:36 | 02:41 | 02:47 |  |  | 76W | 3 | A42 | 01:09 |
| 2 | Mo | 10/28/19 | AA | 4181 | D | MIA | JAX | 10:45 | 12:10 | 00:00 | 01:04 |  |  |  |  |  | 00:00 |
| 3 | Report 10/28/19 @ 06:13 (IND)  Release 12:25/28 (JAX)   Crowne Plaza Jacksonville |  |  |  |  |  |  |  |  | 904-741-4404 |  |  | Layover 16:53 (16:53) |  |  |  |
| 4 | Tu | 10/28/19 |  | 4643 |  | JAX | DCA | 05:56 | 08:00 | 02:04 | 02:04 |  |  | 76W | 3 | A11 | 00:44 |
| 5 | Tu | 10/29/19 |  | 4417 |  | DCA | IND | 08:44 | 10:53 | 02:09 | 02:09 |  |  | 76W | 3 | A35 |  |
| 6 | Report 10/29/19 @ 05:18 (JAX)  Release 11:08/29 (IND) |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

| Totals |  |  |  |  |  |  |  | 06:54 | 08:25 | Dhd 01:04  Pay 08:25 |  |  |  | TAFB 28:55 |

Exceptions    Crew   Comments   Hotel   Hide Drops   Evaluate   Exit

Press F1 for help                                    10/29/19 15:49:26



| Trans | Description | Pairing | From Date | Time | To Date | Time | Credit | Pos | By | Date | Time |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ADV | Notified of Change | I7181A | 10/19/19 | | | | 0:00 | CA | 613393 | 10/20/19 | 16:32 |
| MMM | Modified Pairing | I7181 | 10/19/19 | 15:50 | | 23:51 | 8:28 | CA | 613393 | 10/20/19 | 16:32 |
| DOA | Day Off Assignment | I7143 | 10/28/19 | 06:13 | 10/29/19 | 11:04 | 8:24 | CA | 77777 | 10/12/19 | 16:43 |
| OTA | FLICKA TT ADD | I7181 | 10/19/19 | 15:50 | 10/20/19 | 22:50 | 8:28 | CA | 255266 | 09/18/19 | 22:55 |
| AWD | Bid Award | I7162 | 10/17/19 | 06:13 | 10/19/19 | 01:01 | 11:25 | CA | 255291 | 09/14/19 | 16:03 |
| UNI | Union Business day | UNI | 10/01/19 | 09:00 | 10/01/19 | 17:00 | 5:00 | CA | 255291 | 09/14/19 | 16:03 |
| UNI | Union Business day | UNI | 10/02/19 | 09:00 | 10/02/19 | 17:00 | 5:00 | CA | 255291 | 09/14/19 | 16:03 |
| UNI | Union Business day | UNI | 10/03/19 | 09:00 | 10/03/19 | 17:00 | 5:00 | CA | 255291 | 09/14/19 | 16:03 |
| UNI | Union Business day | UNI | 10/04/19 | 09:00 | 10/04/19 | 17:00 | 5:00 | CA | 255291 | 09/14/19 | 16:03 |
| UNI | Union Business day | UNI | 10/06/19 | 09:00 | 10/06/19 | 17:00 | 5:00 | CA | 255291 | 09/14/19 | 16:03 |
| UNI | Union Business day | UNI | 10/07/19 | 09:00 | 10/07/19 | 17:00 | 5:00 | CA | 255291 | 09/14/19 | 16:03 |
| UNI | Union Business day | UNI | 10/08/19 | 09:00 | 10/08/19 | 17:00 | 5:00 | CA | 255291 | 09/14/19 | 16:03 |
| UNI | Union Business day | UNI | 10/09/19 | 09:00 | 10/09/19 | 17:00 | 5:00 | CA | 255291 | 09/14/19 | 16:03 |
| UNI | Union Business day | UNI | 10/11/19 | 09:00 | 10/11/19 | 17:00 | 5:00 | CA | 255291 | 09/14/19 | 16:03 |

Employee ID: 254627  -or-  Name: COOMES, JOHN JOSEPH    Period: OCT13

22 items - Press F1 for help

UNI  Begins: 11/25/19  09:00    Ends: 11/25/19  17:00    Credit: 05:00

# Exhibit #15

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Brittanni George<br>4934 Ford Street<br>Speedway, IN 46224 | From: Indianapolis District Office<br>101 West Ohio Street<br>Suite 1900<br>Indianapolis, IN 46204 |
|---|---|

| | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 470-2019-02226 | **Frederick J. BruBaker,**<br>**Enforcement Supervisor** | **(463) 999-1148** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [X] | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_____         FEB 2 0 2020
Michelle Eisele,                                    _____
District Director                                    (Date Mailed)

Enclosures(s)

cc:     **REPUBLIC AIRLINE**
        **c/o  David Carr**
        **Ice Miller LLP**
        **One American Square, Suite 2900**
        **Indianapolis, IN  46282**

Enclosure with EEOC
Form 161 (11/16)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**the Genetic Information Nondiscrimination Act (GINA), or the Age**
**Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Courts often require that a copy of your charge must be attached to the complaint you file in court.  If so, you should remove your birth date from the charge.  Some courts will not accept your complaint where the charge includes a date of birth.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 -- not 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request** **within 6 months of this Notice**.  (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**Exhibit #16**



LEGAL COUNSEL

One American Square | Suite 2900 | Indianapolis, IN 46282-0200

Chicago   Columbus   DuPage County, Ill.
Indianapolis   New York   Philadelphia   Washington, D.C.

October 10, 2019

*VIA EEOC ONLINE PORTAL*

Sharon Poindexter, Investigator
sharon.poindexter@eeoc.gov
U.S. Equal Employment Opportunity Commission
Indianapolis District Office
101 West Ohio St., Suite 1900
Indianapolis, IN  46204

> RE:   *Brittanni George v. Republic Airline*
>        *EEOC Case No:  470-2019-02226*

Dear Ms. Poindexter:

The Respondent, Republic Airways Inc. (improperly identified as "Republic Airline" in the Charge of Discrimination), hereafter "Republic" or "Company," hereby provides its statement of position in response to the Charge of Discrimination filed against it by Brittanni George ("George" or "Charging Party") in the above-referenced case filed with the Equal Employment Opportunity Commission ("EEOC") (hereinafter referred to as "the Charge"). Republic denies that it retaliated against Charging Party.

## I.   THE CHARGE

On or about August 2, 2019, George filed her Charge of Discrimination against Republic. In her Charge, George asserts the following claim of retaliation:

> I was employed for approximately 10 years until I was wrongfully discharged in October 2018 in retaliation for participating in a protected activity. My domestic partner filed EEOC Charge No. 470-2018-03161. During my employment, I had no disciplinary or attendance infractions. After I was a witness in a harassment complaint and also my domestic partner filed a charge of discrimination, I was abruptly terminated without reason. Prior to these incidents and my discharge, I was being groomed for a management career.

> I believe that I have been discriminated against and retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended.

The Company denies the Charging Party's allegations. Accordingly, no support exists for the instant Charge, and it should be dismissed.

Ms. Sharon Poindexter, Investigator
October 10, 2019
Page **2** of 15

## II.  DISCUSSION OF RELEVANT FACTS

### A.  Identification of Company and Charging Party

At the time George filed the Charge, Republic operated a combined fleet of about 190 aircraft and offered scheduled passenger service on over 1,000 flights daily to more than 100 cities in the U.S., Canada, Mexico and the Caribbean, through fixed-fee flights operated under airline partner brands, including American Eagle, Delta Connection and United Express. (*See* https://rjet.com/about-republic-airline/. The Company embraces the diversity of its applicants and employees as a means of becoming stronger. (*See* https://rjet.com/about-republic-airline/our-values/.)

On November 24, 2008, Republic hired George as a Crew Scheduler. (**Exhibit 1:** Offer Letter.) As a Crew Scheduler, George assisted the Company with maintaining the integrity of the flight schedule by ensuring that all segments have been assigned to a legal crew. She also tracked crew flight and duty times and coordinated with dispatchers and other departments to resolve problems that arose during the day-to-day operations at Republic. (**Exhibit 2:** Crew Scheduler job description.) Early in George's tenure at Republic, the Company moved George from a Crew Scheduler to a Crew Scheduling Coordinator ("Coordinator") position, still within the Company's crew scheduling department. In this position, like the other Coordinators, George assisted Republic with maintaining the integrity of the Company's flight schedules by ensuring that all segments have been assigned to a legal crew and other job duties as discussed in the Crew Scheduler job description. Additionally, George and other Coordinators handled the more complicated issues and calls in the crew scheduling department. For example, the more complicated calls are routinely routed to Coordinators for direct handling. (**Exhibit 3:** Krista Murdock Affirmation ("Murdock Aff."), ¶¶ 5-6.)

Although the Company did consider George as an individual with potential for more responsibility within the Company, this did not remove her from acting in a manner consistent with Company policies. (*Id.*, ¶ 15.) In fact, Republic's Director of the Crew Scheduling Department, Krista Murdock ("Murdock"), a personal friend of George's, pulled George and John Coomes, a pilot at Republic, aside when they started dating. Murdock did this to help both of them and remind them of their obligations to the Company. Murdock's husband is a pilot at Republic. Murdock attempts to conduct herself in a manner others would view as above reproach. Murdock recommended to George and Coomes that they do the same because to do otherwise could expose them to termination. (*Id.*, ¶¶ 19-21.)

In order to perform her essential duties, George, like all of the Company's Crew Schedulers and Coordinators, had access to non-public/confidential Company information, including, but not limited to, information related to all trip pairings for flights flown by the Company – both revenue service and non-revenue service flying. (**Exhibit 4:** Rose Doria Affirmation ("Doria Aff."), ¶ 5; *see also*, Murdock Aff., ¶ 7.) On October 11, 2018, Republic terminated George's employment because of: (a) her unauthorized communication of Republic's non-public/confidential information to a co-worker for what the Company honestly believed to be an improper purpose; and (b) her dishonesty and lack of cooperation during the Company's investigation into her conduct. (**Exhibit 5:** Termination Letter.)

Ms. Sharon Poindexter, Investigator
October 10, 2019
Page **3** of **15**

### B.   Coomes' EEOC Charge of Discrimination and Lawsuits

On or about August 28, 2018, John Coomes ("Coomes"), a current employee and pilot at Republic, filed a Charge of Discrimination, which charge asserts claims of sex and age discrimination. (**Exhibit 6:** EEOC Charge No. 470-2018-03161 (hereinafter referred to as "the prior Charge".) Although the EEOC sent a copy of the prior Charge to Republic on or about September 4, 2018, the EEOC never asked Republic to respond to the prior Charge. The EEOC issued the Dismissal and Notice of Rights on the prior Charge on or about September 7, 2018. (**Exhibit 7:** Dismissal and Notice of Rights.) As discussed more fully below, the Company began its investigation into George's potential unauthorized communication of Republic's non-public/confidential information to a co-worker for what the Company honestly believed to be an improper purpose in **June 2018,** *i.e.,* two (2) months before Coomes filed the prior Charge. Thus, Coomes filing of the prior Charge could not have been the cause of the Company's investigation into George's possible misconduct or termination.

On November 1, 2018, Coomes filed a "Breach of Contract" lawsuit in Marion County Superior Court 11 (hereinafter referred to as "Coomes I"). (**Exhibit 8:** Coomes I Complaint.) On January 4, 2019, Republic removed Coomes I to federal court (Case No. 1:19-cv-00033-JRS-DML). On January 11, 2019, Republic moved to dismiss Coomes I pursuant to Fed. R. Civ. P. 12(b)(1), which motion the Court granted on June 11, 2019. (**Exhibit 9:** Order Granting Defendant's Motion to Dismiss Coomes I.)

On December 6, 2018, Coomes filed a "Complaint of Hostile Work Environment, Discrimination for Age, Gender and Sexual Orientation and Negligent Retention" lawsuit in Marion Superior Court 13 (hereinafter referred to as Coomes II") related to the allegations raised in the prior Charge. (**Exhibit 10:** Coomes II Complaint.) On January 4, 2019, Republic removed Coomes II to federal court (Case No. 1:19-cv-00034-TWP-MPB).

On February 8, 2019, Republic moved to dismiss Coomes II pursuant to Fed. R. Civ. P. 12(b)(6) because it fails to state a claim upon which relief may be granted, which motion stood fully briefed as of March 22, 2019. (*See* **Exhibits 11, 12 and 13:** Briefing on Republic's Motion to Dismiss Coomes II.) On September 20, 2019, the court dismissed the vast majority of Coomes II. (**Exhibit 14:** Entry on Defendant's Motion to Dismiss.)

### C.   The Company's Relevant Policies and Procedures

#### 1.   Policies Against Discrimination and Retaliation

As part of the Company's commitment to professionalism, the Company's policies are readily accessible on the Company's intranet website to assist its employees with awareness of their obligations to the Company. For example, the Company's Non-Discrimination and Harassment Policy, located in its Associate Handbook, provides, in pertinent part, that:

Ms. Sharon Poindexter, Investigator
October 10, 2019
Page **4** of **15**

> [The Company] . . . does not and will not permit Associates to engage in unlawful discriminatory practices, . . ..

> Acts of discrimination, harassment, intimidation and retaliation will not be tolerated by the Company and are grounds for disciplinary action up to and including termination.

*****

> Retaliation is not permitted against any Associate filing a complaint under this policy or assisting with an investigation of a complaint. Any acts that an Associate believes are retaliation should be reported immediately.

(**Exhibit 15:** Associate Handbook, Section 1.4, ¶¶ 1, 2 and 6, Non-Discrimination and Harassment Policy).)

### 2.      Other Handbook Policies

### 2.2      General Policies

*****

### 2.2.3   Privacy of Information

The Company considers all non-public information about the Company and Associates to be highly confidential. For Company information, this includes, but is not necessarily limited to: operating and financial information; compensation data; marketing strategies; pending projects and proposals; and operations or maintenance manuals.

*****

**Individuals who manage or use this type of information are required by the Company to protect this information from unauthorized** modification, **disclosure**, and destruction. The means of protection used shall be commensurate with the risk of exposure, the value of the information and the available computing resources.

*****

Ms. Sharon Poindexter, Investigator
October 10, 2019
Page **5** of **15**

### 2.2.4   Conflict of Interest

Company Associates, at all levels, are expected to loyally promote all legitimate interests of the Company. Therefore, each Associate has an obligation to refrain from activities which might have an adverse effect upon the Company or may interfere with an Associate's independent exercise of his or her best judgment in furtherance of the Company's best interest. In particular, corporate funds, materials, supplies, proprietary or inside information, or other resources shall not be used in any way to advance an Associate's personal business, financial, or other interests. Business dealings that appear to create a conflict between the interests of the Company and an Associate are unacceptable. A potential or actual conflict of interest occurs whenever an Associate is in a position to influence a decision that may result in a personal gain for the Associate or an immediate family member (i.e., spouse or significant other, children, parents, siblings) as a result of the Company's business dealings.

*****

(*Id.*, Sections 2.2.3 and 2.2.4 (General Policies).)

### 7.2   Information Technology Use Policy

### 7.2.1   Purpose

The Company relies on its computer network to conduct its business. To ensure that its technology resources are utilized properly by its Users, the Company has created this Computer Use Policy (the "Policy").

The rules and obligations described in this Policy apply to all users (the "Users") of the Company computer network, . . .. Violations will be taken very seriously and may result in disciplinary action, including possible termination, and civil and criminal liability.

*****

### 7.2.3   Policy

The Information Technology Resources are the property of the Company and may be used only for legitimate Company business purposes. Users are permitted access to the Information Technology Resources to assist them in performance of their jobs.

Ms. Sharon Poindexter, Investigator
October 10, 2019
Page **6** of **15**

Use of any Information Technology System or tool is a privilege that may be revoked at any time.

*****

**7.2.9 E-mail Use**

E-mail is made available to approved users solely for the purpose of facilitating effective business operations.

• All users are responsible for their e-mail activity and are encouraged to use e-mail in a judicious and ethical manner at all times.

*****

• Violation of these usage policies is grounds for being reprimanded, suspended or terminated.

(*Id.*, Sections 7.2.1, 7.2.3 and 7.2.9.)

Pursuant to the Company's Standards of Conduct policy, "serious misconduct . . . may warrant immediate disciplinary action, which may be accelerated to any level at any time, including suspension or termination of employment" (*Id.*, Section 9.1.1; *see also*, Section 9.2.4. ("The disciplinary process is progressive in nature but may be implemented or accelerated at any step, including termination, depending upon the severity of the situation.").) Conduct Violations include, but are not limited to, the following:

3. Alteration, misuse, unauthorized access or removal from Company premises, without proper authorization, . . . Company records or confidential information of any kind.

9. Violation, misuse or abuse of Company's IT System/Computer Policy.

21. Dishonesty

22. Unprofessional or immoral behavior or indecent conduct.

48. Revealing private Company business to any unauthorized person, the nature or content of any form of communication or the substance and/or results of any conference or meeting pertaining to Company affairs.

Ms. Sharon Poindexter, Investigator
October 10, 2019
Page **7** of **15**

52.   Abuse or Violations of any or all Company policies and operational procedures.

58.   Failure to fully cooperate with an investigation.

(*Id.*, Section 9.1.2.)

Pursuant to the Company's Information Technology Use policy and the Company's policies regarding the use of non-public/confidential information, Associates/employees are prohibited from sharing and/or disclosing non-public/confidential Company information with anyone (inside or outside the Company) that does not have a legitimate basis to receive and/or view such information, or which third-party the Company reasonably believes has the intent to use such information for an improper purpose, personal gain or a purpose contrary to the Company's legitimate business purposes.  If the Company learns that an Associate/employee has improperly shared and/or disclosed such non-public/confidential information, then that Associate/employee's employment with Republic will be terminated.  (Doria Aff., ¶ 4.)

### 3.    Relevant Pilot CBA Provision

H.   Open Time

1.   Open Time is Flying that becomes available during the Bid Period including Trip Pairings, or portions thereof, dropped because of illness or injury, Vacations, Leaves of Absence, Training, Charters, Extra Sections, or other revenue Flying, or those Pairings not awarded or assigned in the Line Construction process[].

(**Exhibit 16:**  Relevant Provision from Pilot's CBA, Article 6.H.1)

B.   Flying as a Management Pilot

1.   Management Pilots will not be eligible to bid or be awarded any Flying through the bidding process.

2.   Management Pilots may fly for the purpose of maintaining FAR currency requirements. If any Pilot is displaced due to this section, that Pilot shall be dropped from the affected Flying and pay protected for the Trip Pairing.

3.   Management Pilots shall not fly as a Captain unless they are Senior to the most Junior Captain on the same Equipment and Certificate, or unless the

Ms. Sharon Poindexter, Investigator
October 10, 2019
Page **8** of **15**

> Seniority of the Management Pilot allows him to hold the Status of Captain on that Certificate and Equipment.
>
> 4. Management Pilots may be assigned scheduled Flying in lieu of a Line Pilot in the event of an emergency when no other Line Pilots, other than Short Call Reserve Pilots$_{[]}$ are available or as otherwise provided in this Agreement.
>
> 5. No Management Pilot shall fly as Captain with another Captain flying as First Officer, unless the Captain flying as First Officer is doing so on a voluntary basis.
>
> 6. Management Pilots shall not be allowed to pick up, or otherwise be assigned, Open Time more than 36 hours prior to the Report Time of the Trip Pairing.
>
> 7. The Company shall ensure that the Union may validate the Flying schedule of Management Pilots through the Crew Scheduling software solution on property. If access to view the Flying schedule of Management Pilots becomes unavailable, the Company shall provide the Union the monthly Flying schedules of all Management.

(*Id.*, Article 15.B.)

### D. Miscellaneous Facts Relevant to George's Allegations

#### 1. George's Prior Discipline

George's Charge asserts: "During my employment, I had no disciplinary or attendance infractions. " Not so. Prior to the misconduct that led to her termination, George received the following discipline:

- June 17, 2009, Written Job Performance Warning for notifying a flight crewmember of the incorrect report time for his trip on June 14, 2017, which error resulted in the crewmember not showing at his correct report time, which failure caused a flight delay. (**Exhibit 17:** June 17, 2009 Written Warning.)

- October 16, 2017, Written Job Performance Warning for accumulation of six (6) attendance occurrences in the preceding 12-month period. (**Exhibit 18:** October 16, 2017, Performance Counseling Record.)

- April 27, 2018, 2017 Performance Evaluation, Reliability and Dependability, section notes George's written warning for attendance issues. (**Exhibit 19:** 2017 Performance Evaluation.)

## 2.   George's Reference as Potential Witness (Rather Than Participation) in Harassment Investigation Conducted by the Company in the Summer of 2017

In the summer of 2017, Republic employee Shane Tilley ("Tilley") made a complaint of harassment against two (2) management employees – Pat Gannon ("Gannon") and Michael Dee ("Dee"). With the assistance of Ice Miller, the Company initiated and investigated Tilley's allegations, which investigation was completed in November 2017. The Company took appropriate and measured corrective action against both Gannon and Dee in early 2018. Almost two (2) dozen individuals were interviewed during the investigation. Although Coomes, George's boyfriend, identified George as a possible person that could be interviewed as a part of the investigation, the Company did not interview her. Based upon Coomes' representations of her testimony, the Company deemed her testimony cumulative and as a result did not interview her. George's identification as a witness during the Company's investigation of the Tilley complaint played no role in the decision to terminate George's employment. The Company did not terminate or discipline anyone for participating in, or being referenced in, this investigation. As noted above, the Company appropriately disciplined Gannon and Dee based upon the substantiated allegations found during the investigation. (Doria Aff., ¶ 13.)

## 3.   Events Leading to George's Termination

On October 11, 2017, the Company had a Flight Operations meeting. Flight Operations meetings are monthly meetings attended by representatives from both the Company's management and the Company's pilot's Union. The pilot's Union identified Coomes as attending the October 11 meeting as a member of the pilot's Union. (**Exhibit 20:** Tiffane Pappillion Affirmation ("Pappillion Aff."), ¶¶ 5 and 6.)

"Boondoggle Flying" was on the agenda for the October 11 meeting. The pilot's Union uses the term "boondoggle flying" in reference to non-revenue flying by the Company for philanthropic purposes (relief efforts), talent acquisition/recruitment (a/k/a PTAT (pilot talent acquisition trips) flying, and other flying that is outside the normal scope of the Company's operations. The pilot's Union calls it "boondoggle flying," somewhat jokingly, because the Company usually uses management, hand-selected people or alumni (*e.g.*, if a talent acquisition trip is to a particular college or university, the Company hand-picks an alumni from this college or university) to fly these trips. The pilot's Union takes the position that the Company's hand-picking of the pilots for "boondoggle flying" violates Article 6 of the applicable pilot's CBA. The Company disagrees with this position. (*Id.*, ¶ 6; *see also*, CBA, Art. 15.B.6, *supra*.)

Marc Anderson ("Anderson"), counsel for the pilot's Union, stated that although he disagreed with the Company's position, at that time, he was not inclined to test the CBA on this issue, making reference to a relief flight down to St. Thomas. Anderson stated that the pilot's Union believes flights like the St. Thomas flight fall under "Open Flying," found in Article 6 of

Ms. Sharon Poindexter, Investigator
October 10, 2019
Page **10** of 15

the pilot's CBA. Anderson said that a pilot attempted to pick this flight up and was denied. Tiffane Pappillion ("Pappillion"), a Company representative at the meeting asked, "Do you mean Coomes?" Everyone in the room laughed and Anderson responded, "Yes." Pappillion inquired whether or not it was Coomes because Coomes had already been known to the Company as a person that would attempt to pick up so called "boondoggle" flights. The Company and the pilot's Union did not reach a resolution on "boondoggle flying" at the October 11 meeting. (*Id.*, ¶ 7.)

At the time of this October 11 meeting, and through the end of George's employment at Republic, the Company understood George and Coomes to be in a relationship. In October 2017, the Company suspected that Coomes received information from George that enabled him to pick up flights for the purpose of getting bumped and paid. The Company did not investigate this further at that time. (*Id.*, ¶ 8.)

On January 26, 2018, Coomes filed a grievance related to a "boondoggle flight" that he attempted to pick up (and for which the Company believed he wanted to pick up for the sole purpose of getting bumped and paid). Coomes somehow obtained knowledge of a flight pairing twenty-two minutes after its creation, and sixteen (16) minutes after it had been placed and removed from then Vice President of Flight Operations Pat Gannon's ("Gannon") schedule. The Company suspected that Coomes obtained the flight information from his girlfriend, George. Coomes contacted Crew Scheduling Manager Brian Essig ("Essig") in an attempt to pick up the flight pairing. Essig denied Coomes' request. The Company ultimately assigned Ed Bagden ("Bagden"), a Management pilot, to serve as Captain on the flight. The Company assigned Bagden in accordance with Art. 15.B.6. of the CBA—the creation of the flight and assignment occurred within thirty-six (36) hours of the trip, thus removing it from Art. 6.H.4. of the CBA. On February 21, 2018, in accordance with Article 18 of the pilot CBA, the Company and the pilot's Union conducted a Grievance Settlement Conference on Coomes' grievance. The parties did not reach a resolution. On February 28, 2018, the Company denied Coomes' grievance. (*Id.*, ¶ 9.)

On May 29, 2018 – May 30, 2018, the Company conducted a relief flight to Haiti. Although Coomes had no reason to know about this relief flight, or the assigned flight crew, he somehow did, and specifically knew that Gannon served as Captain on this flight. (**Exhibit 21: Wade Sheek Affirmation ("Sheek Aff."), ¶ 4.)**[1]

At around this same time period, Coomes, a licensed attorney in addition to being a pilot, acted as opposing counsel for former Republic pilots from whom Republic sought the recovery of prepaid bonuses. Like the Company's crew scheduling information, information regarding the Company's former pilots, and the Company's possible recovery of prepaid bonuses, was non-

---

[1] During a Flight Operations meeting, Coomes, a pilot for the Company and a Union Steward, bragged about picking up flights, so called "boondoggle" flights that he knew had been intended for management, or other hand-picked individuals, to serve as the Captain on the flight. Since the filing of the Charge by George, the Company has attempted to locate the flight segments that Coomes bragged about picking up just to be bumped and paid. The Company has not been able to locate the flight pairing that Coomes bragged about picking up. (Pappillion Aff., ¶ 10; *see also,* Sheek Aff, ¶ 5.)

public/confidential information.   The Company suspected that Coomes had somehow been receiving non-public/confidential information on Republic's former pilots.   Based on this history, and Coomes' bragging about picking up flights intended for management for the sole purpose of being bumped and paid, the Company suspected that Coomes had a source inside the Company feeding him non-public/confidential information for his (Coomes') personal benefit. The Company saw George as the obvious potential source of Coomes' information.   Thus, the Company decided to investigate further how Coomes may be obtaining his insider information. To that end, the Company reviewed George's Company e-mail inbox as well as all e-mails sent from   a   Company   e-mail   account   to   Coomes'   private   e-mail   address: johncoomes@coomeslaw.com.   **During this review, the Company found an e-mail sent by George (from her Company e-mail account) to Coomes' private e-mail account that included information related to the Haiti relief flight, including Gannon's assignment as Captain on the same.**   (Sheek Aff., ¶¶ 6 and 7 and Ex. A; **Exhibit 22:** May 29, 2018, e-mail from George to Coomes (hereinafter "the George e-mail").)

In late June, early July 2018, armed with the information discovered via the e-mail review, Sheek and Koscal met with Doria to discuss a further investigation into George's sharing of non-public/confidential information with Coomes.   Doria assigned Dan Copp ("Copp") and Dawne Davis ("Davis") to conduct the investigation.   The Company decided against George's director, Krista Murdock, or anyone else in the crew scheduling department, being directly involved in George's investigation because of the personal relationship between George and Murdock.   The Company's HR department exclusively handled the investigation in light of this personal relationship.   Due to Doria's attention being focused on flight attendant collective bargaining agreement negotiations in the summer of 2018, and other matters being handled by Copp and Davis, the investigation did not start immediately.   (Sheek Aff., ¶ 8; Doria Aff. ¶ 6.)

On September 12, 2018, the Company received another grievance from the pilot's Union (Grievance No. 18-09-0626) related to "boondoggle flights" and the assignment of flight crews on the same.   On September 18, 2018, in accordance with Article 18 of the pilot CBA, the Company and the pilot's Union conducted a Grievance Settlement Conference on this grievance. During this conference, Coomes, in attendance on behalf of the pilot's Union, in what the Company perceived to be a bragging manner, mentioned that he picked up one of the flights in question, a PTAT flight, and subsequently got displaced and paid for the flight.   (Doria Aff., ¶ 7; Pappillion Aff. ¶ 11.)

Shortly after this meeting, Doria met with Copp and Davis to check on the status of their investigation.   She instructed them to immediately commence their investigation of George. (Doria Aff. ¶ 7.)   Republic's then new Vice President, System Operations Control (which covered the crew scheduling department), Michael Scrobola ("Scrobola") (who began his employment with the Company in July 2018), was made aware of and agreed to the plan for the George investigation.   (**Exhibit 23:** Michael Scrobola Affirmation ("Scrobola Aff."), ¶ 5.)

Copp and Davis created a plan for the investigation, which plan included interviewing George, Murdock and more than a dozen Crew Schedulers/Coordinators.   They concluded these interviews in early October 2018 and reported the results of the same back to Doria on October 9, 2018.   Copp reported to Doria that he and Davis interviewed fifteen (15) Coordinators from all

shifts. All of the Coordinators interviewed, including George, advised the Company that: (a) they have received no solicitations from the pilot's or flight attendant's Unions to send Company information to a pilot or the Union solely for the purpose of aiding in the filing of a grievance; (b) they have received no direction by anyone in the Company to provide information to the pilot's or flight attendant's Unions for the purpose of filing a grievance; and, (c) they have never sent unsolicited information to the pilot's or flight attendant's Unions to bring attention to noncompliance with the CBA. Copp and/or Davis also shared with Doria that, in their opinion, George did not fully cooperate in the investigation and did not find her denial of misconduct credible due to her vague responses during her interview and the Company's possession of the "smoking gun," the George e-mail. Doria agreed with the assessment. Although George said she did not normally send non-public/confidential information to Coomes, she claimed that she did not know why she sent the information in question to him and that Coomes did not request it. George likewise claimed that she did not recall whether she sent any more (similar) information to Coomes. George's story, with half-truths and a convenient lack of memory, smacked of weak credibility, dishonesty, and lack of cooperation. (Doria Aff., ¶ 8.)

Doria had meetings with several individuals regarding the results of the investigation. Ultimately, Scrobola, Sheek, Koscal, Paul Kinstedt (Vice President – Chief Operating Officer) and Doria all agreed and concluded that George's employment needed to be terminated because of her unauthorized communication of Republic's non-public/confidential information to a co-worker (Coomes) for what the Company honestly believed to be an improper purpose and George's dishonesty and lack of cooperation during the Company's investigation into her conduct. Scrobola and Davis advised George of her termination via telephone on October 11, 2018, and followed up that call with a letter to George advising her of her termination. (*Id.*, ¶¶ 9-10; Sheek Aff., ¶¶ 9-10; Scrobola Aff., ¶¶ 6-11.) At no time did the Company take any action with regards to George's employment because of any protected activity taken by George. (*Id.*)

## E. Republic's Treatment of Similarly Situated Employees

The Charging Party fails to identify any specific comparator(s) related to her claim of retaliation. Regardless, the Company treated the Charging Party the same as it did the only other individuals similarly situated to her but outside her protected class. In the past 6+ years, other than George, Republic management learned of only one other individual (Francis Stevens ("Stevens")) that improperly shared Republic's confidential information both inside and outside the Company. (Doria Aff., ¶ 11.)

On July 22, 2017, the Company terminated Stevens's employment (said termination being characterized as a resignation for Company internal and external communication purposes) because of Stevens' breach of his fiduciary duty to the Company, which conduct stems from Steven's release of non-public/confidential information to a third-party. Stevens disclosed non-public/confidential Company information (information about the Company's internal business and management decisions related to another employee to a third-party (a former member of the Company's board of directors) (via e-mail) that did not have a legitimate basis to receive and/or view such information. Stevens took his actions, bypassing the Company's CEO (Bryan Bedford), COO (Kinstedt) and CAO (Koscal), and outside of normal procedures, in an attempt to

get the employee fired.  The former board member advised the Company of the sharing of information by Stevens.  Even if the third-party had still been a board member for the Company, Stevens' conduct stood as a breach of his fiduciary duty to the Company, a violation of the Company's Information Technology Use policy, and the Company's policies regarding the use of non-public/confidential information.  Simply put, Stevens shared the information/sent the e-mail outside the Company's policies and procedures, *i.e.*, outside the Company's normal complaint procedure process and without use of the Company's anonymous hotline.  (*Id.*, ¶ 12.)

Prior to terminating Stevens and similar to George, Company representatives met with Stevens to determine if he did in fact send the non-public/confidential Company information to the third-party in breach of his fiduciary duty to the Company and also to inquire of Stevens whether he held any legitimate, or protected, reason for sending the e-mail/information.  Unlike George, Stevens admitted his behavior and confirmed that he did in fact send the e-mail/share the non-public/confidential information with the third party.  He likewise admitted that his actions did not possess any legitimate business reason or protected classification/status.  Stevens said he had gone to Koscal in approximately 2014 and raised his concerns about the employee at that time.  Although Stevens said that he was not satisfied with what the Company did with the information provided to Koscal by him in 2014, Stevens admitted that he had not suffered any retaliation for having raised these concerns with the Company in 2014.  (*Id.*)

Similar to George, Stevens improperly released the Company's non-public/confidential information to a third party.  He did this because he did not like what he perceived to be the Company's inaction in response to his raising of concerns about a co-worker three (3) years prior to his release of information.  An employee does not stand entitled to violate Company policy and release non-public/confidential information because he or she does not like the actions taken by a Company.  The Company treated this individual similarly to George when faced with the similar serious misconduct of sharing non-public/confidential Company information, *i.e.*, it terminated his employment.  (*Id.*)

### III.    **LEGAL DISCUSSION**

To prove her retaliation claim, George must adduce evidence that: (1) she engaged in a statutorily protected activity; (2) Republic took materially adverse action against her; and (3) there is a causal connection between the activity and the adverse action.  *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017).  The causation standard is more stringent for a retaliation claim than for a discrimination claim.  *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  To succeed on a Title VII retaliation claim, a plaintiff must show that the defendant would not have taken the adverse action but for the protected activity.  *Id.*  "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id.  Republic does not dispute that George's termination qualifies as a materially adverse employment action.  It does dispute that George engaged in statutorily protected activity and that there exists a causal link between the same and her termination.

Ms. Sharon Poindexter, Investigator
October 10, 2019
Page **14** of **15**

### A.   George Did Not Participate In Title VII Protected Activity

Title VII "prohibits retaliation against employees who engage in statutorily protected activity by opposing unlawful employment practice or participating in the investigation of one." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing 42 U.S.C. § 2000e–3(a)).  To qualify as a protected activity, George must demonstrate that she had a good faith belief that she was opposing conduct prohibited by Title VII.  *Rozumalski v. W.F. Baird & Assocs., Ltd.*, No. 17-CV-523-JDP, 2018 WL 5885552, at *4 (W.D. Wis. Nov. 9, 2018), *aff'd*, No. 18-3586, 2019 WL 3955383 (7th Cir. Aug. 22, 2019); *see also, O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011).

George identified the protected activities that the she participated in as the following: (1) participating as a "witness in a harassment complaint"; and, (2) her "domestic partner" (Coomes) filed a charge of discrimination.  ***Coomes filing of the prior Charge*** in August 2018 fails to qualify as a good faith belief on the part of George that she was opposing conduct prohibited by Title VII.   A similar flaw exists with regards to George's other alleged protected activity. Although George asserts that she participated in a prior harassment investigation conducted by Republic, the facts do not bear this out.  Yes, Coomes identified George as a potential witness; however, Republic did not interview her as a part of its investigation of the Tilley matter.  Thus, it cannot be stated by any stretch of the imagination that George participated in the Company's investigation of the Tilley matter and by extension it cannot be stated that she participated in an investigation protected by Title VII.

### B.   No Causal Link Exists Between Any Alleged Protected Activity and George's Termination

Had George participated in Title VII protected activity, the continued analysis of her retaliation claim invokes the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016).  Under this "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765.  To state an actionable Title VII retaliation claim, George "must demonstrate . . . there is a causal connection between" her alleged protected activity and her termination. *Rowlands v. United Parcel Service – Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (internal citation and quotation marks omitted).  George failed to produce *any*, let alone *sufficient*, evidence linking her termination to the alleged protected activity.   While Republic did terminate George's employment, it did not do so in retaliation of any alleged protected action by George.  George has identified no evidence disputing the basis for her termination.  Republic terminated George in the regular course of business, consistent with its past practice when presented with similar situations involving individuals that did not participate in protected activity.

The Seventh Circuit has recognized the following four types of evidence on which a plaintiff may rely to prove discrimination or retaliation: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly-situated employees outside of the protected group systematically

Ms. Sharon Poindexter, Investigator
October 10, 2019
Page 15 of 15

receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017) (*citing Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014)).

Had George raised Title VII protected activity in her Charge, she has only raised the possible timing of the prior Charge (August 2018) and her subsequent termination (October 2018), as the causal link in this case. The Seventh Circuit has repeatedly held that "[s]uspicious timing alone rarely is sufficient to create a triable issue," and that "mere temporal proximity is not enough to establish a genuine issue of material fact." *Riley v. City of Kokomo*, 909 F.3d 182, 188-89 (7th Cir. 2018) (*quoting Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009)) (in turn *quoting Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008)). "Rather, a "plaintiff must ordinarily present other evidence that the employer's explanation ... was pretext for retaliation."" *Id.* (*quoting Tibbs v. Admin. Office of the Ill. Cts.*, 860 F.3d 502, 505 (7th Cir. 2017)); *see also Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) ("We have often invoked the general rule that temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter.") (citation and internal quotation marks omitted). George has failed to identity any evidence addition to possible timing to support her claim. Thus, she fails to show pretext, and by extension, fails to hold an actionable Title VII retaliation claim. Simply put, there fails to exist a causal connection between Coomes' filing of the prior Charge, or her identification as a potential witness in the Company's Tilley investigation, and George's termination. Thus, George's retaliation claim fails to allege a plausible claim.

## IV.    CONCLUSION

Based on the foregoing, the Company denies the allegations set forth in the Charge and submits that the Charging Party possesses neither a factual nor a legal basis for her claims. The Company did not violate any law or illegally retaliate against the Charging Party on any basis and the appropriate remedy to this Charge is its dismissal. If you have any questions regarding the above-provided information, or if you require additional information to aid in your investigation of the Charge, please do not hesitate to contact us at your convenience.

Respectfully submitted,

*s/ David J. Carr*

David J. Carr

*s/ Paul C. Sweeney*

Paul C. Sweeney

Counsel for Respondent, Republic Airways

Enclosures

## <u>AFFIRMATION UNDER OATH OF KRISTA R. MURDOCK</u>

I, Krista R. Murdock, pursuant to 28 U.S.C. § 1746, state and declare under penalty of perjury as follows:

1. I am over 18 years of age, and competent to testify as to the matters contained herein.

2. I have personal knowledge of all information contained herein.

3. I am employed by Republic Airways ("Republic" or "the Company") as Director, Crew Scheduling. In this position, I am familiar with the Company's crew schedulers. I have worked at Republic since 1/28/2008. I started with the Company in the position of Manager of Crew Scheduling for Chautauqua Airlines, a previous subsidiary of the Company. After six (6) years, I was promoted to my current position, Director, Crew Scheduling.

4. I am familiar with former Republic crew scheduler Brittani George ("George"). I know her both professionally and socially. I consider George a friend outside the office. I hired George as a Crew Scheduler. We became friends outside the office after George joined the Company. George worked in my department her entire career at the Company. In 2018, George's direct supervisors were Samantha Battle and Brian Essig. I was the next level of management in the Crew Scheduling department.

5. Early in George's tenure at Republic, the Company moved George from a Crew Scheduler to a Crew Scheduling Coordinator ("Coordinator") position, still within the Company's crew scheduling department. At the time of George's termination, she held the title of Coordinator. A Coordinator is in a higher pay bracket than Crew Schedulers, is in charge of a shift, works with dispatch and delegates issues as needed to Crew Schedulers. Coordinators hold a slightly higher authority level than Crew Schedulers.

---

Exhibit 3

---

RA 000562

6.     As a Coordinator, George assisted Republic with maintaining the integrity of the Company's flight schedules by ensuring that all segments have been assigned to a legal crew and other job duties as discussed in the Crew Scheduler job description.  Additionally, George and other Coordinators handled the more complicated issues and calls in the crew scheduling department.  For example, the more complicated calls are routinely routed to Coordinators for direct handling.  There is not a separate job description for the Coordinator position.

7.     In order to perform her essential duties, George, like all of the Company's Crew Schedulers and Coordinators, had access to non-public/confidential Company information, including, but not limited to, information related to all trip pairings for flights flown by the Company – both revenue service and non-revenue service flying.

8.     The pilot's Union uses the term "boondoggle flying" – this refers to non-revenue flying by the Company for the purpose of things such as philanthropic purposes (relief efforts), talent acquisition/recruitment (a/k/a PTAT (pilot talent acquisition trips) flying, and other flying that is outside the normal scope of the Company's operations.  The pilot's Union calls it "boondoggle flying," somewhat jokingly, because the Company usually uses management, hand-selected people or alumni (e.g., if a talent acquisition trip is to a particular college or university, the Company hand-picks an alumni from this college or university) to fly these trips.  The Company schedules the flight crews for these flights in accordance with Art. 15.B.6. of the pilot's collective bargaining agreement, outside the normal open time bid process.  In 2018, in picking the pilots for these flights, PTAT members or Flight Operations management directed crew scheduling who would fly the so-called "boondoggle flights."  As of September 2019, in picking the pilots for these flights, I typically contact Paul Kinstedt, Senior Vice President, Chief Operating Officer, and/or Rose Doria, Vice President – Labor Relations, at the Company.  Just

- 2 -

recently, pursuant to talks between Kinstedt and the pilot's Union, the Company has put PTAT flights out to bid by pilots.

9.   I have never sent information to a pilot to assist him/her with getting a flight pairing that I knew was for charitable flying, recruiting or some other flight for which the Company was going to select a person or management pilot. This would be highly unusual and against the Company's technology use and confidentiality policies. The pilot's Union has asked me *after* a flight how the flight crew was picked for the flight. In response to such requests I have advised the pilot's Union that the Company picked the flight crew. These types of questions come to me, a member of scheduling management or labor relations, not Coordinators in my department. This type of inquiry has never been asked of the Coordinator position by the pilot's Union (during my employment at Republic) and has only been queried through myself, scheduling management or labor relations. Coordinators are only authorized to provide the pilot's Union crew information for a situation that requires immediate resolution.

10.   When I respond to questions from the pilot's Union at the Company, I respond to said questions using my Company e-mail account. To the best of my knowledge and belief, I never send responses to a member of the pilot's Union's personal e-mail account. Rather, I send e-mail responses to pilot's Union's questions via the pilot's Company e-mail account or the Union e-mail account address. If I have ever sent a response to a pilot's personal email address, which I don't recall every doing, it would have only occurred because the pilot sent the original email request to me from his/her personal e-mail account acting in his/her capacity as a member of the pilot's Union. I also can't control a distribution list submitted from the pilot's Union for a scheduling inquiry and will respond to the original request.

- 3 -

11.     I have never been solicited by anyone in the pilot's Union to send them Company flight pairing information solely for the purpose of aiding the Union with the filing of a grievance. This would be highly unusual and against my duty of loyalty to the Company and the Company's confidentiality policy (and in violation of the Company's technology use policy if the communications were via e-mail).     As noted above, the Union does send information/requests about particular situations (i.e., after a situation).   The pilot's Union has asked for screen shots of the pairing.   The pilot's Union makes these requests in the course of a grievance, not to aid it in filing a grievance.   After consultation with the Company's labor relations/human resources department, I respond to such requests when instructed to do so.

12.     I have never sent information to a pilot or the pilot's Union for the purpose of bringing to their attention something that I thought was not in compliance with the pilot's collective bargaining agreement.  As a member of management at the Company, this would be strange and not normal.

13.     I have no knowledge of George filing a Charge of Discrimination with the EEOC.

14.     I have no knowledge of George participating in any harassment investigations during her tenure with the Company.

15.     I observed that George had a lot of potential. Early in her tenure at the Company, George did not advance because the other individuals interviewed had more experience. During her employment at the Company, I had discussions with George about making herself more marketable the next time an advancement opportunity arose.   George's potential, admittedly present, did not remove her from a responsibility to act in a manner consistent with Company policy.

- 4 -

RA 000565

16.     In late September 2018, I was made aware of George being investigated for possible misconduct. I was interviewed as a part of the investigation on October 1, 2018. The Company's summary of my interview (RA 000178, a copy of which is attached hereto and incorporated herein by reference) is accurate.

17.     I have been advised that George sent information about a flight pairing to her boyfriend, John Coomes ("Coomes"), a pilot for the Company, and a member of the pilot's Union, to his private e-mail account, to possibly assist him with filing a grievance. George's conduct was improper and violated the Company's confidentiality and technology use policies because she had no authority to send the non-public/confidential information to a co-worker. In my opinion, George had no legitimate business reason to send the information to Coomes. Also, even if the information had been requested by Coomes as a part of a grievance, such requests go through me, not Coordinators like George. I know of no other Coordinator doing what George did.

18.     I do not know how George's actions came to the Company's attention.

19.     My husband is a pilot at Republic. I do not speak with my husband about work or share non-public/confidential information with my husband. For example, I have never shared flight-pairing information with my husband for any purpose. I attempt to conduct myself in a manner that others would view as above reproach. I don't want anyone to accuse me of misconduct or with improperly sharing information with my husband.

20.     I know of George's and Coomes' relationship because George told me of the same, and it was generally known at the Company. I had a good working relationship with George and we remain friends. George and I continue to be friends.

- 5 -

RA 000566

21.     When George and Coomes first started dating, which I believe was approximately 3-4 years ago, I had a conversation with both of them about how my husband and I interacted at work. I told both of them that I give my husband no favoritism and recommended that they too not give any favoritism with/to each other when they interacted at work. I told both of them that to do so would likely be grounds for termination. We had this conversation in a casual environment outside the office. I have had similar conversations with other people at Republic in a similar situation. I do not recall the names of others with whom I had such conversations.

FURTHER, AFFIANT SAITH NOT.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Date: _10-8-19_ _____
                        Krista R. Murdock

## AFFIRMATION UNDER OATH OF MICHAEL SCROBOLA

I, Michael Scrobola, pursuant to 28 U.S.C. § 1746, state and declare under penalty of perjury as follows:

1.      I am over 18 years of age, and competent to testify as to the matters contained herein.

2.      I have personal knowledge of all information contained herein.

3.      I am employed by Republic Airways ("Republic" or "the Company") as Vice President, System Operations Control ("SOC"). I have worked at Republic in this position since July 9, 2018. Generally, I am responsible for leading the Company's SOC team in delivering operational excellence for the Company's airline partners as well as ensuring that the Company operates at the highest level of safety. Currently, the Company operates just over 1000 flights daily with 190 aircraft in our fleet. The areas that report to me are: Dispatch, Crew Planning, and Crew Resources (scheduling).

4.      In my position at the Company, I am familiar with the Company's Crew Schedulers/Coordinators, as their department—Crew Resources (scheduling)—reports to me, and with former Crew Scheduler/Coordinator Brittanni George ("George").

5.      In mid to late September 2018, shortly after I started working at the Company, Rose Doria ("Doria"), Vice President, Labor Relations for the Company, contacted me to advise me that human resources ("HR") was investigating George for possible misconduct/violations of the Company's general policies and Standards of Conduct as provided in the Company's Associate Handbook. Doria advised me that George had shared non-public/confidential Company information about a relief flight to Haiti, and the Company's assignment of a management pilot as Captain on the same, with her boyfriend, John Coomes ("Coomes"), a pilot

> Exhibit 23

for the Company, and a member of the pilot's Union, without authorization/permission, by sending the same to Coomes' via his personal, not Company, e-mail address. The Company believed/believes that George shared the e-mail with Coomes for a non-operational/business related reason, *i.e.*, to assist him with a grievance against the Company. Doria advised me that HR was handling the investigation because George's director, Krista Murdock ("Murdock"), had/has a personal relationship with George. I agreed with this course of action. Doria also advised me that HR was planning on interviewing George at the end of September, and several other individuals shortly thereafter. I agreed with this course of action as well.

6.      HR proceeded with interviewing George on September 28, 2018, and numerous other individuals in September and October 2018. Doria shared with me a copy of the notes from the interviews with George, Murdock, George's director and friend, and Dalton Kocher ("Kocher") (the Kocher interview was provided to me as an example of the Crew Scheduler/Coordinator interviews). According to Dan Copp, Manager, Employee Relations, for the Company at that time, information Doria shared with me that, in addition to interviewing George, Murdock and Kocher, HR interviewed more than a dozen crew schedulers/coordinators from all shifts. All of these individuals, as well as Murdock and Kocher, responded "no" when asked the following: (a) have you ever received a solicitation from the pilot's Union to send Company information to the Union solely for the purpose of aiding the pilot's Union in the filing of a grievance; (b) have you ever been given a directive by anyone in the Company to provide information to the pilot's Union for purpose of filing a grievance; and, (c) have you ever sent unsolicited information to the pilot's Union to bring their attention to possible noncompliance with the CBA?

- 2 -

RA 000569

7.      On or about October 10, 2018, I met with Doria and Wade Sheek, Vice President and General Counsel for the Company, to discuss the results of the George investigation and possible disciplinary action.  Doria filled me in on the results of the investigation as outlined in paragraph 6 above.  Due to the severity of George's misconduct, Doria recommended that George's employment should be terminated because of her unauthorized communication of Republic's non-public/confidential information by her to a third party/co-worker for what the Company honestly believed to be an improper purpose, her dishonesty and her lack of cooperation during the Company's investigation into her conduct.  I agreed and concurred with the termination decision and memorialized the termination and the reasons for the same, in an October 11, 2018, letter to George.

8.      On October 11, 2018, I participated in a call with George, along with Dawne Davis ("Davis") from the Company's HR department.  The purpose of the call was to advise George of the Company's decision to terminate her employment.  We advised George of her termination consistent with the results of the Company's investigation and as memorialized in the October 11, 2018, termination letter.  Prior to the termination call to George, Davis and I called Murdock, and met with George's supervisors, Brian Essig and Samantha Battle, to advise them of the termination decision.

9.      I possess no personal knowledge of George participating in any harassment investigation at the Company or any other possible protected activity.

10.     I possess no personal knowledge of George being "groomed for a management career" at the Company.

11.     I possess no personal knowledge of the Company retaliating against George because of protected activity.

- 3 -

RA 000570

FURTHER, AFFIANT SAITH NOT.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Date:   October 9, 2019_____          _____

Michael Scrobola

- 4 -